[No. 3683.     Decided June 25, 1901.]

THE STATE OF WASHINGTON, *Respondent*, v. P. J. CONCANNON, *Appellant*.

| 25 | 327 |
| f25 | 422 |

| 25 | 327 |
| e37 | 414 |
| 37 | 415 |

CRIMINAL LAW — GRAND LARCENY — EVIDENCE.

In a prosecution for grand larceny, in which the evidence of an accomplice has been admitted showing that the stolen goods were put in a sack and placed under a table in a room of defendant's house, it is admissible to interrogate witnesses who had been in the room at the time the stolen goods were said to be there whether they had seen either the goods or a sack in the room.

SAME — ACCOMPLICES — UNCORROBORATED TESTIMONY.

A verdict of guilty in a criminal prosecution is unwarranted when based upon the evidence of an accomplice who was addicted to the habitual use of opium, and under its influence while testifying, when such evidence is uncorroborated upon any material matters.

Appeal from Superior Court, Pierce County.—Hon. W. H. H. KEAN, Judge. Reversed.

*John F. Dore, A. R. Titlow* and *Hugh Farley,* for appellant.

*Fremont Campbell,* Prosecuting Attorney, for the State.

The opinion of the court was delivered by

REAVIS, C. J.—Defendant was convicted of the crime of grand larceny. The information charged him with

taking and assisting in taking, stealing, and carrying away certain musical instruments, all of the value of $350, the property of A. A. Tayler. The principal witness at the trial was J. P. Dunlap, an accomplice. The evidence produced by the state was substantially as follows: On about the 17th of September, 1898, late at night or early in the morning, the music store of A. A. Tayler & Co., situated on C street in Tacoma, was entered by the witness Dunlap, who made the entry by unlocking the door with a key then in his possession; that he remained several hours in the building, and took the musical instruments described in the information, and carried them away. Dunlap testified with particularity as to the manner in which he entered the store and took the instruments, and that he was aided and assisted by the defendant. The defendant had been connected with the city police of Tacoma as a detective for some years. In March, 1898, as a police officer, he had arrested Dunlap for having burglarious instruments in his possession, and had frequently come in contact with Dunlap, who was then known to the police as "Dun." At that time and previously Dunlap, under the name of Dun, was known to the police as an habitual criminal. The larger portion of his time since youth had been spent in the penitentiary, he having served four terms for felonies, including larcenies. He was frequently shadowed by the city detectives, and particularly by Concannon. He was sometimes used to procure information relative to crimes committed by other suspects. During the summer preceding the stealing of the musical instruments, the defendant's connection with the city police was severed, and he opened an office in the city as a private detective. Dunlap testifies that thereafter defendant proposed to him that Dunlap should enter the music store, take the musical instruments and secrete them, and that defendant would then, in the

capacity of detective, negotiate with the owner of the stolen goods for their return, secure a reward therefor, and divide the proceeds with Dunlap; that the reason assigned by defendant for the commission of the crime was to assist in establishing defendant's reputation as a detective in the business community. A number of conferences between himself and defendant relative to the larceny are detailed by the witness, in which he states that defendant procured and gave to witness the key with which he opened the door of the music store. Written notes were produced by the witness, which he stated had come from defendant during the pendency of the agreement between them to steal the musical instruments, and at great length the witness detailed many conferences and meetings relative to the larceny and in pursuance of the agreement; that defendant was present, though outside, and on the street, when the larceny was committed; that some of the musical instruments in a sack were taken by himself and defendant to defendant's home, which was a small hotel; that these instruments were placed in the dining room early on the morning of the 18th of September, which was Sunday; that witness secreted the other instruments in an old building, and also, on the same Sunday, took those which had been carried to defendant's place away from there, and secreted them with the others; that defendant told witness thereafter that he was negotiating with Tayler, the owner, for the return of the goods, but that such negotiations were unsuccessful, as Tayler would not pay sufficient reward for their return. It seems that thereafter the witness was charged with the larceny, though sentence had not been passed upon him at the time of the trial. Dunlap stated he was to be leniently dealt with because of his testimony given at the trial of defendant. He also testified that since about 1883 he had been habitually using opium in large

quantities. During the trial, and while he was testifying, which occupied several days, opium was regularly administered to him; he could not proceed without the drug. The state also produced Mary Dunlap, the wife, who testified that she had been the wife of J. P. Dunlap for some two years. She had also been arrested at one time by the defendant, in connection with her husband. She was, and had been for a long time, an habitual user of narcotics, both chloral and opium, and at times during her examination declared herself bordering on hysteria. She testified that she knew of the intended larceny of the musical instruments; that during that time she heard detached portions of conversations between her husband and defendant; that she saw a key, which defendant gave to her husband; that she heard mention made of a music store. She could not identify any key. On cross examination she frequently, under her privilege, declined to answer questions that might be incriminating. Mr. Tayler, the owner of the musical instruments stolen, testified to the circumstances attending the larceny; also that thereafter the defendant came to his store and presented his card as detective and offered to undertake their recovery for a reward of $100; and that they had several conversations in regard to it; that defendant, in the early part of their negotiations, stated that he would restore the goods and arrest the parties, or ask no compensation. They did not agree upon the terms, and defendant did not undertake the recovery of the goods for Mr. Tayler. There were other circumstances introduced by the state, through various witnesses, which are of no considerable importance,—such as evidence relating to a young lady, an acquaintance of defendant and one who conferred with him somewhat in the detective business, having been with a clerk of Tayler and his sister in recreation at a summer camp, where the young lady had the

opportunity of access to the clerk's valise, in which a key
to the music store was left; and perhaps the intention of
this evidence was to suggest that a wax impression could
have been taken of this key, which furnished the model
for the key that unlocked the music store, and which Dun-
lap had testified to. But such evidence is mentioned only
to illustrate that many of the circumstances and incidents
related by various witnesses for the state were only sug-
gestive of suspicion or opportunity of the defendant. After
the trial was concluded, and a verdict of guilty returned
against the defendant, and immediately after the motion
for a new trial was overruled, but before sentence, the
witness J. P. Dunlap, who was then in the county jail, and
had been for a long time prior thereto, under conviction of
this larceny, and charged with other offenses, informed
the sheriff that he desired to make a statement of the truth
in regard to the testimony he had given at the trial, and
the sheriff informed counsel for the defendant of Dunlap's
request. Counsel came to the jail, and there Dunlap, in
the presence of the sheriff, and afterwards to others who
are mentioned, made the statement, in substance, that he
was ready to go into court and testify to the motives that
induced him to testify in the trial, and that he would
make it so plain that his statement would be obvious.
Dunlap was then informed that sentence would be passed
upon defendant the same day. He thereupon requested
that the court be advised that he would testify that the
defendant, Concannon, had nothing whatever to do with
the Tayler robbery. The sheriff stated that no inducement
or suggestion had been made to Dunlap to procure any
statement from him; that again on the following day, and
after the county physician had prescribed the necessary
opium for Dunlap, and in the afternoon, the wife of Dun-
lap, who was also a witness at the trial, called to see her

husband, and Dunlap said to his wife, in the presence of the sheriff: "I am going to make a clean breast of it, and tell the whole truth and exonerate Concannon"; and the wife responded: "Think it all over before you do it." On a subsequent day Dunlap said, in the presence of counsel and the sheriff, that he was too weak to make out his statement then, and he had some misgivings whether the authorities would not punish him for perjury; that again some days subsequently, when the wife was with Dunlap, and in the presence of the sheriff, the wife said to the sheriff in Dunlap's presence, referring to her husband: "He will make the statement which he said he would make, and he will make it fuller and stronger than he told you;" and Dunlap answered: "Yes; I am only a thief; but even thieves have honor; and I don't care if they give me the full term of the law. I will come out with the whole truth, and I will make my statement tomorrow, and show how this job was put up against Concannon. I will have it ready by tomorrow evening." Dunlap reiterated this statement to several other persons voluntarily, but afterwards stated that he would not make the statement until after his trial and sentence, when he would make a full and complete one entirely exonerating the defendant. In this abstract of the evidence on the part of the state no mention has been made of that produced by the defendant. It may be passed with the suggestion that it absolutely contradicted all the material evidence for the state.

1. A number of errors have been assigned by counsel for defendant, but they are not of sufficient moment to require attention in detail. The trial was a tedious one, some irritation of temper was exhibited by counsel, and perhaps the court was not unruffled during its course. We are not sure but remarks complained of by counsel on the part of the court were justified by the over-zeal shown by

counsel.  When counsel have the opportunity to present objections, they must not persist in argument after the court has ruled.  It does not appear that the court commented upon the testimony, or stated an opinion as to the credibility of witnesses, and any inadvertent observations were fully explained in the advice afterwards given to the jury relative to its function in determining the facts.  Relative to questions propounded by counsel for defendant to witnesses who, on the day mentioned, saw the diningroom in which Dunlap said some of the musical instruments were placed by himself and the defendant, as to whether they saw certain instruments or a sack, and to which objection was sustained, it is appropriate to mention that we see no good reason why the questions should not have been allowed.  Dunlap had testified specifically to certain musical instruments that were placed in this room and under a table, and it would seem that the questions were not leading, which merely directed the witnesses directly to the fact.  No substantial error is perceived in the instructions.  Those tendered by counsel for defendant which expressed the law, were, in substance, given to the jury, and the whole tenor of the instructions was fair.

2.    The seventh instruction given was in the following language:

"In regard to the testimony of the witness Jos. Dunlap, who the court instructs you is an accomplice, the court instructs you that, while it is a rule of law that a person may be convicted upon the uncorroborated testimony of an accomplice or accomplices, still a jury should always act upon such testimony with great care and caution, and subject it to careful examination in the light of all other evidence in the case; and the jury ought not to convict upon such testimony alone, unless, after a careful examination of such testimony, you are satisfied beyond all reasonable doubt of its truth and that you can safely rely upon it."

This court has not had before it an instruction in this form stating the rule of law that a person may be convicted upon the uncorroborated testimony of an accomplice. In the case of *Edwards v. State,* 2 Wash. 291 (26 Pac. 258), the superior court instructed the jury "that to convict one charged with crime upon the testimony of an accomplice, the accomplice must be corroborated in some material matter tending to show the accused to have been implicated in the commission of the crime;" and it was substantially said of that instruction that, under the testimony, it was correct, though, upon review of the case here, it was determined there was no material corroboration, and it was observed:

"As to the other point, it is true that we have no statute requiring the corroboration of an accomplice, such as is found in a few of the states. It is also true that at common law conviction upon the unsupported testimony of an accomplice was upheld to the extent, at least, that, although the higher courts and law writers laid it down that a trial court ought to advise the jury not to convict on such testimony, it was not reversible, even if they did not so advise. Yet the books are full of cases from courts not bound by any statute, both in England and America, where corroboration has been held necessary. 1 Amer. & Eng. Enc. Law, tit. 'Accessory.' § 18, p. 74. Cases are rare, indeed, where, if the prosecutor has the assistance of a willing accomplice, no corroborative testimony can be produced. In practice it is almost invariably attempted, and juries are told, as in this case, that unless there is corroboration they should acquit. Perhaps the true view of the matter is that in many, if not in most cases, the evidence of an accomplice, uncorroborated in material matters, will not satisfy the honest judgment beyond a reasonable doubt, and that it is clearly insufficient to authorize a verdict of guilty. But there may occur other cases where, from all the circumstances, the honest judgment will be as thoroughly satisfied from the evidence of the accomplice of the guilt of the defendant as it is possible

it could be satisfied from human testimony; and in such cases justice demands that the evidence be accepted, so far as the court is concerned. *Collins v. People,* 98 Ill. 584. The testimony of George Rose was not of the latter class, and the court below did right to charge the jury not to convict without corroboration."

A close scrutiny of all the evidence introduced by the state does not show substantial corroboration of the accomplice Dunlap's testimony in any material fact connecting the defendant directly with the crime committed by Dunlap. The statements of some apparently pertinent facts are frequently from utterly discredited sources. Something of a light backward is thrown upon the credibility of the accomplice by his statements, subsequent to the trial, to the sheriff and other persons, which cannot be ignored when viewed in connection with the other circumstances surrounding his credibility, under the principle stated in *Edwards v. State, supra;* that is, it is not one of those cases where, from all the circumstances, the honest judgment will be thoroughly satisfied by the evidence of the accomplice of the guilt of the defendant. The habitual use of opium, as shown, by Dunlap, is known to utterly deprave the victim of its use and render him unworthy of belief. This, it is true, is primarily a question of his credibility which the jury may determine, but it is within the discretion of the superior court, when the appearance and action of the witness may show him to be under the influence to such a degree as to be incapable of honest and intelligent conception of what he is testifying to, to exclude him from testifying while in such condition. Apparently the trial court did not consider that the witness had reached this stage of untrustworthiness, and a court of review has not equal opportunity to see the witness, and will rarely interfere with such discretion exercised at the trial. Much that has been said of the credibility of the

witness J. P. Dunlap may also be applied to Mary Dunlap.

But, in the weight given to the corroborating testimony of the accomplice, we conclude that this case should fall under the rule stated in *Edwards v. State, supra,* and the judgment is reversed and the cause remanded for a new trial.

DUNBAR, FULLERTON and ANDERS, JJ., concur.

WHITE, J., concurs in the result.