[No. 42834.    En Banc.    May 23, 1974.]

THE STATE OF WASHINGTON, *Respondent*, v. VIRGINIA SUE
RENNEBERG *et al.*, *Petitioners.*

*F. James Gavin* (of *Gavin, Robinson, Kendrick, Redman
& Mays*), for petitioners.

*Lincoln E. Shropshire, Prosecuting Attorney*, and *Adam
Moore, Deputy*, for respondent.

BRACHTENBACH, J.—Virginia Sue LaVanway was charged with and convicted of grand larceny. Her codefendant, Milton V. LaVanway, whom she married after they were charged with these crimes, was charged with and convicted of aiding and abetting grand larceny. The Court of Appeals affirmed the convictions and we granted review.

The defendant wife had been employed by a restaurant but had been discharged from that employment. In the early evening of June 24, 1970, the defendants visited the restaurant to obtain her final paycheck. The defendants went to the rest rooms in the rear of the restaurant and then returned to the front where defendant wife used the telephone which was located next to the cash register. Defendant husband stood near the restaurant door where he paced back and forth, looked about and kept moving around, according to the witnesses. The restaurant employee who was the only one operating the cash register that evening heard the register bell, indicating the register was being opened, and went toward the cash register. He saw defendant wife facing the cash register, then the defendants left the restaurant. A witness reported to the employee that his son had seen a young woman at the register with a stack of money bills in her hand. An immediate tally of the register disclosed a shortage of approximately $250.

The first issue arises from the following testimony elicited by the prosecutor:

Q. Mrs. LaVanway, is it true that in June of this year you were addicted to or were using a narcotic drug? A. Yes. Q. Mrs. LaVanway, is it true that on July 14th, you went onto a methadone program to cure a narcotic addiction or use? A. Yes.

It appears that the question of admissibility of this testimony was discussed in chambers before the trial started. Apparently, although it is not clear from the record, the court indicated that testimony as to drug addiction would be inadmissible in the state's case. Only after defendant wife took the stand and testified as to her character, as described later, did the court allow this testimony. Admissi-

bility of evidence of prior drug addiction can be considered on at least two distinctly different grounds. First, that it relates to the witness' credibility and second, that it is an unrelated act of misconduct, admissible to contradict character evidence. It is obvious that there is an immense difference between the practical effect of the two theories of admissibility. If it is admissible to attack credibility, it will come in whenever a defendant testifies while, if it is restricted to countering character evidence, it will only be used against that defendant who chooses to put his or her character into evidence. As to admissibility relating to credibility, there is a division of authority. *See* 3A J. Wigmore, *Evidence* § 934 (J. Chadbourn rev. 1970); 52 A.L.R.2d 848 (1957).

We note that we are not confronted with a situation where it is contended that the witness was under the influence of drugs at the time of the events to which he testifies as in *Doe v. State*, 487 P.2d 47 (Alas. 1971), or that the witness is under the influence at the time of testifying such as in *State v. Reyes*, 99 Ariz. 257, 408 P.2d 400 (1965).

█ The Court of Appeals recognized the division in the authorities but felt bound by our decision in *Lankford v. Tombari*, 35 Wn.2d 412, 213 P.2d 627, 19 A.L.R.2d 462 (1950), wherein a terse holding concluded that drug use or addiction is relevant to veracity. In view of society's deep concern today with drug usage and its consequent condemnation by many if not most, evidence of drug addiction is necessarily prejudicial in the minds of the average juror. Additionally there is no proof before the court connecting addiction to a lack of veracity. If such medical or scientific proof were made, it might well be admissible as relevant to credibility. Absent such proof its relevance on credibility or veracity is an unknown factor while its prejudice is within common knowledge. The *Lankford v. Tombari* decision is limited accordingly by our view herein.

█ However, the alternate and more restrictive ground of character impeachment dictates admissibility here. The

defendant wife voluntarily put her character before the jury. She testified to her work experience, that she had attended college, that she had been a candidate in the Miss Yakima pageant, that she had participated in a glee club, drill team, pep club and was the treasurer of a science club. Implicit in such testimony is the painting of a picture of a person most unlikely to commit grand larceny. While the character of defendant husband was not so clearly put into evidence, it was introduced sufficiently to subject the defendant husband to the same questions as recited above which were asked of the wife. There was testimony as to his occupation as a professional photographer, as to his physical dress on the day in question, as to his somewhat lengthy engagement and subsequent marriage to the defendant wife whose character had been so vividly pictured, as to his working in his garden at home and as to the planned attendance at a family barbecue on the day of the alleged crime. The state was entitled to complete the tapestry with his admitted drug addiction.

This court has consistently followed the rule stated in *State v. Emmanuel*, 42 Wn.2d 1, 14, 253 P.2d 386 (1953), that:

> [I]f a defendant puts his prior conduct into issue by testifying as to his own past good behavior, he may be cross-examined as to specific acts of misconduct unrelated to the crime charged. *State v. Armstrong*, 29 Wash. 57, 69 Pac. 392; *State v. Melvern*, 32 Wash. 7, 72 Pac. 489; *State v. Hollister*, 157 Wash. 4, 288 Pac. 249; *State v. Johnson*, 180 Wash. 401, 40 P. (2d) 159; *State v. Kelly*, 187 Wash. 301, 60 P. (2d) 50.

The court instructed the jury that evidence of prior misconduct was to be considered only as bearing on credibility and on the weight to be given to the witness' testimony. That instruction was proposed by the defendants. The record discloses that the defendants felt the instruction was necessary to lessen the impact of the evidence. Defendants had a choice to propose no instruction, to propose one

relating to credibility or one relating to character. The choice was made and cannot now be urged as error.

Defendant husband assigns error to the court's instruction on aiding and abetting which was as follows:

> You are instructed that every person concerned in the commission of grand larceny, whether he directly or indirectly commits the acts constituting the offense or aids or abets in the commission, is guilty of grand larceny.
>
> Thus, the act of one individual among several who are present at the scene and participate in grand larceny, would be the acts of each and all, as a principal, whether each of them took, stole, or carried away the property or not. For a person to be an aider or abettor by his presence, he must be ready to assist, ready to render assistance should it become necessary, or must assist the perpetrator of the crime by his presence.
>
> You are further instructed that to aid and abet may consist of words spoken, or acts done, for the purpose of assisting in the commission of a crime or of counseling, encouraging, commanding or inducing its commission. To constitute an aider or abettor, it is essential that the aider or abettor should share the criminal intent of the person or party who committed the offense.

The defendant proposed an instruction which included this language: "There must be some overt act, the doing or saying of something, directly or indirectly contributing to a criminal act, and mere assent to a criminal act is insufficient."

■ Defendant relies on *State v. Peasley*, 80 Wash. 99, 141 P. 316 (1914), which held erroneous an instruction which said that assent alone would constitute aiding and abetting. It is true that assent to the crime alone is not aiding and abetting, but the instruction correctly required a specific criminal intent, not merely passive assent, and the state of being ready to assist or actually assisting by his presence. The correct rule is set out in *State v. Redden*, 71 Wn.2d 147, 150, 426 P.2d 854 (1967):

> [T]he jury was properly instructed that the defendant might be considered a principal if it found that he directly or indirectly aided and abetted in the commission

of the crime. A separate instruction, requiring the finding of an overt act, was unnecessary; since the instruction, as given, details what acts constitute aiding and abetting under the statute; which acts themselves signify some form of overt act in the doing or saying of something that either directly or indirectly contributes to the criminal offense.

*Accord, State v. Palmer,* 1 Wn. App. 152, 459 P.2d 812 (1969). *State v. Catterall,* 5 Wn. App. 373, 486 P.2d 1167 (1971), also cited by defendant, is not inconsistent with our holding. It merely confirms that physical presence and assent alone are not sufficient to constitute aiding and abetting. The remaining assignments of error dealing largely with matters within the discretion of the trial court are without merit.

Judgments of conviction are affirmed.

HALE, C.J., and HUNTER, HAMILTON, STAFFORD, and WRIGHT, JJ., concur.

HALE, C.J. (concurring in part)—I have signed the court's opinion and concur in all of it except that part which purports to predict a future overruling of *Lankford v. Tombari,* 35 Wn.2d 412, 213 P.2d 627, 19 A.L.R.2d 462 (1950), a case which held that proof of drug addiction is relevant to credibility. The rule admitting such evidence cuts both ways, and it is available to both defense and prosecution and I think should be retained. When the prosecution is compelled by the force of circumstances to rely upon the testimony of narcotic addicts to establish guilt, the defendant in all fairness should be permitted to show the addiction as a factor in assessing credibility.

In tampering with the *Lankford v. Tombari* rule, the court, I think, makes four errors: First, it overrules a long-established precedent when it need not do so in order to reach an otherwise sound decision; second, it predicts the future actions of this court on a question of law not now before it; third, it suggests that proof of drug addiction may be rendered relevant and admissible if the court will only

halt the trial and take a collateral excursion into the field of medicine and psychology to try the general issue of drug addiction as it affects one's veracity; and fourth, it departs from the long-established common-law technique of handling appeals in order to prophesy that this court will, when the point is directly in issue, categorically hold inadmissible evidence of drug addiction unless a collateral trial is held, and it implies that in a future case proof of drug addiction must be excluded unless the evidence preponderates in the particular case on trial that drug addicts are inclined to falsehood. When the court ruled in the instant case that proof of defendant's drug addiction became relevant and admissible because she voluntarily put her character in issue, that should have been the end of the matter. Its discussion of the ramification of *Lankford v. Tombari, supra,* both was unnecessary to a decision in this case and will probably lead to a wrong conclusion when the point is examined again.

If the facts of this case, however, can be said to necessarily evoke a discussion of the *Lankford v. Tombari* precedent, requiring that it either be followed or overruled in order to reach a decision in the instant case, I would adhere to *Lankford* because, in my judgment, it declares the better rule. To require expert testimony that drug addiction does affect one's truthfulness before allowing evidence of it creates a collateral issue of fact not germane to the genuine issues on trial, and substitutes the opinion of experts for the commonsense of the jury. It is the court's prerogative to rule upon the admissibility of evidence and the jury's to decide its weight and effect; the court rules as a matter of law and the jury decides as a matter of fact. Now the court converts an issue of law into an issue of fact, a process which will frequently, I think, produce ludicrous results. In some cases, in the same courthouse, the evidence, because of expert testimony, will be rendered admissible while across the hall the same issue will be resolved differently as a matter of fact and the identical evidence rendered inadmissible.

This court's opinion in *Lankford* that proof of drug addiction is admissible as a matter of law left to the jury to decide what weight, if any, should be given it. That proposition, I think, rests on a sound rationale, authoritatively supported. 3A J. Wigmore, *Evidence* § 934 (Chadbourn rev. 1970), states the principle correctly:

> Any diseased impairment of the testimonial powers, arising from whatever source, ought also to be considered:
>
> . . .
>
> Accordingly, the *morphine* or other *drug habit*, in that it may have had such an effect, should be received.

(Footnote omitted.)

The rule allowing proof of drug addiction as a factor to be weighed in assessing credibility has withstood the test of time. For example, in 1916, the Supreme Court of Idaho, in a widely cited opinion, passed directly upon the issue when a dying declaration was put in evidence in a murder prosecution. The victim, a Chinese unfamiliar with the English language, had made the dying declaration in Chinese. It was held admissible when introduced through an interpreter. To test the credibility and competency of the witness who had related the declaration, defendant asked on cross-examination, "Isn't it a fact that you are an habitual user of opium?" The trial court sustained an objection to the question. On defendant's appeal, however, the Supreme Court of Idaho reversed, holding that evidence of the fact that the witness was an opium user was admissible as relevant to his competency and credibility, saying:

> We believe it will be admitted that habitual users of opium or other like narcotics, become notorious liars.
> . . .
>
> . . . But we do mean to hold that the habitual use of morphine, cocaine and other like narcotics, which inevitably tend to impair the mind, destroy the memory and moral character of a witness, may be shown for the purpose of affecting his credibility or the weight that should be given to his testimony.

*State v. Fong Loon,* 29 Idaho 248, 258-60, 158 P. 233 (1916). *Accord, Chicago & N.W. Ry. v. McKenna,* 74 F.2d 155 (8th Cir. 1934); *Wilson v. Thurston Nat'l Ins. Co.,* 251 Ark. 929, 475 S.W.2d 881 (1972).

Accordingly, I think we should leave well enough alone. *Lankford v. Tombari, supra,* is not now before us and I would not gratuitously repudiate it either collaterally or directly.

HAMILTON, J., concurs with HALE, C.J.

FINLEY, J. (dissenting)—At first blush, it may seem that the basic thesis of the majority opinion places this court in line with modern authority on the law of evidence which excludes evidence as to drug usage or addiction for character impeachment purposes. But this would not be an accurate characterization of the majority opinion for reasons indicated hereinafter.[1]

The majority indicates that *exclusion of drug evidence* relating to testimonial capacity is warranted and as to reasons for exclusion states "[i]n view of society's deep concern today with drug usage and its consequent condemna-

---

[1]It is of the utmost importance that it be understood that this case involves the admissibility of character impeachment testimony relating to former drug addiction; moreover, the state makes *no contention* that the admission of former drug usage extracted from the defendants was offered to prove *motive*. The question of motive is a separate and independent ground of evidence admissibility, and, therefore, is analytically unrelated to character impeachment. *See generally* 1-2 J. Wigmore, *Evidence* §§ 117-19, 385-87, 391-92 (3d ed. 1940). It seems to be common knowledge that narcotic addiction may lead an addict to resort to criminal activities to support the habit. Clearly motive evidence introduced to establish a causal link between a drug habit and a consequential robbery is properly admissible. In the instant case, however, there was no contention that the defendants' use of narcotic drugs motivated the robbery. If the dissenting views expressed herein were to prevail, upon retrial, the state may establish a drug-related motive for the robbery. The record in this case, as presently posited, reveals no suggestion that the defendants acted out of a narcotic compulsion to feed their habit. Therefore, admissibility of such evidence upon the independent ground of criminal motive is not properly before this court.

tion by many if not most, *evidence of drug addiction is necessarily prejudicial in the minds of the average juror."* (Italics mine.) Had the majority halted at this juncture, I would find myself in general agreement on this issue. However, the majority retreats from the indicated position and proceeds to condone admission of the concededly prejudicial evidence, curiously enough on the ground of *moral* character impeachment. Such a fine distinction regarding the law of evidence in such a sensitive area may find solace and acceptance in some quarters. But the attempted distinction is simply too unrealistic to withstand careful analysis. First, all character evidence, positive or negative, is designed to accomplish the same result—to establish the relative *credibility* of the witness. *See generally* C. McCormick, *The Law of Evidence* § 41 (2d ed. E. Cleary 1972); 3A J. Wigmore, *Evidence* §§ 920-22 (J. Chadbourn rev. 1970). Hence, when any evidence is offered which bears upon the character of a witness, it is, in effect, supposed to say to the jury, "ladies and gentlemen, on the basis of this evidence, you are to give greater [or less] credence to the testimony of the witness." The legitimate or legal purpose of character evidence is to give the triers of fact a proper perspective upon the trustworthiness of a witness' testimony. Thus, character evidence, either of a supportive or impeaching nature, must relate to the general trait of *credibility*.[2]

Secondly, character impeachment may be broken down into two types: (1) that of impeachment based upon *capacity,* and (2) impeachment upon a *moral* ground. The former category relates to instances where the witness is lacking in testimonial capacity due to insanity, intoxication, disease or other infirmities. In the absence of expert testimony to the contrary, the majority would not allow the introduction of evidence of former drug usage as bearing upon the witness' capacity for truthtelling, nor would I. The second category embraces impeachment based upon a

---

[2]Actually, a more descriptive term for an evidentiary assault upon a witness' character might be more accurately and descriptively termed "credibility impeachment."

lack of moral character which could affect the witness' credibility in the matter being litigated. Thus, for example, a prosecutrix in a rape case may be impeached by a prior history of prostitution. *See generally* 3A J. Wigmore, *supra* §§ 920-30. The majority appears to hold that evidence of a former drug habit or experience may be admitted to counter defense evidence of good character.[3] The moral component is apparently the "alternative and more restrictive ground of character impeachment" under which admission of this type of evidence is purportedly subsumed.

Finally, there is evidence which may be excluded from permissible character impeachment because its highly prejudicial nature outweighs its probative value. Thus, evidence of misconduct or criminal convictions is often excluded from the prosecutor's impeachment of character if admission of such evidence would unduly prejudice the jury. *See* 3A J. Wigmore, *supra;* C. McCormick, *supra,* §§ 42-43. For reasons elaborated hereinafter, evidence of former drug addiction should not be considered or allowed to play a role in moral character impeachment. Such evidence should be excluded on policy grounds due to its highly prejudicial nature.

In analyzing the intricacies of the law of evidence, complex nuances cannot be allowed to become distracting and misleading. Again, the sole object of character impeachment is to weaken the *credibility* of the witness in the eyes

---

[3]While it is true in the instant case that Virginia LaVanway offered some biographical data, however in the case of codefendant Milton LaVanway, the majority would appear to deem essential identification information, such as name, address, and profession coupled with defendant's version of his activities on the day of the crime, to constitute an offer of good character. The lack of merit in this position is self-evident and requires no refutation. *See generally* 3A J. Wigmore, *Evidence* ch. 32 (J. Chadbourn rev. 1970). As an additional note, obviously, any such rule would "chill" the defendant's constitutional right to take the witness stand in his own behalf. *See* Const. art. 1, § 22; RCW 10.52.040; *State v. Hill,* 83 Wn.2d 558, 520 P.2d 618 (1974). *Cf.* 8 J. Wigmore, *Evidence* § 2276 (McNaughton rev. 1971). For purposes of this dissent, I will assume, notwithstanding the facts, that the defendants have truly put their character into question.

of the jury. It is *not* the purpose of character impeachment to allow a wide-ranging evidentiary assault upon a witness in an effort to convince the jury that the witness is a nonconformist as to acceptable social mores. That unworthy ploy should be correctly termed character assassination, not character impeachment. Thus, to comply with the oft forgotten goals of proper character impeachment, evidence must be constrained and limited to the admission of evidence which clearly bears upon *credibility*.

IMPEACHMENT OF CHARACTER OR CREDIBILITY BASED UPON THE WITNESS' LACK OF CAPACITY

It seems to me the majority confuses the *capacity* and *moral* components of character impeachment *which, as noted, are necessarily subsumed subcategories of character or credibility impeachment*. As to the problem of a witness' lack of capacity, there is a chronological split of authority. Some courts would admit and others would exclude evidence of drug usage to impeach credibility based upon incapacity. *See* 3A J. Wigmore, *supra* at §§ 931-40. *See also* cases collected in 3A J. Wigmore, *supra* at § 934 n.1; Annot., 52 A.L.R.2d 848 (1957, Supps. 1967, 1973); Comment, 16 S. Calif. L. Rev. 333 (1943). The schism separating the courts may well be a product of the prevailing societal attitude, at the time of trial, concerning drug addiction. Thus, many of the early courts took the position that as a matter of common knowledge "[t]he habitual use of opium . . . is known to utterly deprave the victim of its use and render him unworthy of belief." *State v. Concannon*, 25 Wash. 327, 335, 65 P. 534 (1901). Another approach characterized by Wigmore as the "dream theory state" finds its expression in *State v. Fong Loon*, 29 Idaho 248, 258, 158 P. 233 (1916), "The habit of lying comes doubtless from the fact that the users of those narcotics pass the greater part of their lives in an unreal world, and thus become unable to distinguish between images and facts, between illusions and realities." Many of the early courts based their opinion that drug usage necessarily led to pathological lying upon contemporary and ostensibly competent medical authority. *See, e.g.,*

*State v. Fong Loon, supra; Effinger v. Effinger,* 48 Nev. 205, 228 P. 615, 239 P. 801 (1925). *See also* Wharton & Stille, *Medical Jurisprudence* § 1111 (5th ed. 1905). However, time and the healing arts change, and mendacity or truthtelling as an inevitable consequence of drug addiction is no longer a medical truism. *See generally* Note, *Testimonial Reliability of Drug Addicts,* 35 N.Y.U.L. Rev. 259 (1960); Note, 1966 Utah L. Rev. 742.

The landmark case of *Kelly v. Maryland Cas. Co.,* 45 F.2d 782 (W.D. Va. 1929), *aff'd,* 45 F.2d 788 (4th Cir. 1930), is the progenitor of the modern line of authority which rejects the contention that drug addiction, in itself, ineluctably yields untruthfulness. In a scholarly opinion, the *Kelly* court would, however, follow the suggestion of Wigmore and allow expert testimony to establish the possible impairment of a witness' faculties through drug use.

The decision of when to allow expert testimony bearing upon truth or veracity was squarely faced by the New York Court of Appeals in *People v. Williams,* 6 N.Y.2d 18, 159 N.E.2d 549, *cert. denied,* 361 U.S. 920, 4 L. Ed. 2d 188, 80 S. Ct. 266 (1959). In *Williams,* the New York court surveyed the current medical literature in a well-reasoned decision and concluded:

> [I]t is only after long and serious deliberation that we hold inadmissible expert testimony that narcotics addicts of the same type as a witness are unworthy of belief in the absence of a clear and convincing showing to the full satisfaction of the Trial Judge that such is the consensus of medical and scientific opinion. The reliability of such a thesis must be clearly established before a jury may be subjected to its influence.

*People v. Williams, supra* at 26.

Thus, synthesizing the salient reasoning of the *Kelly* and *Williams* courts, I concur with the majority that the better rule is to allow expert testimony relating to the effects of drug usage when it involves the impairment of the witness' faculties.[4]

---

[4]This is substantially the approach suggested in C. McCormick, *The Law of Evidence* § 45, at 95 (2d ed. E. Cleary 1972). "[A]s to drug

### Impeachment Of Character Or Credibility
### On Moral Grounds

The majority, contrary to the weight of modern authority, however, would allow testimony of former drug usage to impeach the defendant's character where there has been a minimal offer of good character evidence by the defense. This, of course, does not relate to the *capacity* component, but to the *moral* component of character impeachment, *i.e.*, the witness' truthfulness or mendacity. *See* 3A J. Wigmore, *supra* at §§ 920-30.

But the majority, I think, has proven too much. It has conceded that there is no established link between drug addiction and the witness' proclivity for truthtelling. Nor does there exist in established jurisprudence the suggested "alternative and more restrictive ground of character impeachment" as all impeachment on moral grounds is necessarily directed and limited to whether or not the witness is telling the truth. 3A J. Wigmore, *supra* at §§ 920-23; C. McCormick, *supra* at §§ 41-42. In the case at bar, moral character evidence of former drug usage has no relevance upon the question of the witness' credibility, and thus has no function in proper character impeachment.

I must conclude, therefore, that evidence of former drug usage with the accompanying correlative social opprobrium it evinces has no proven relationship to a witness' capacity or moral inclination for truthtelling. Unscientifically established admissions of this nature place before the jury evidence of unrelated misconduct which will inevitably tend

addiction to which more social odium has been attached, many decisions allow it to be shown to impeach, even without evidence that it did in the particular case affect truth-telling, although apparently more courts, absent a particular showing of effect on the witness's veracity, would exclude it. In respect to both addictions [to drugs and alcohol] the excluding courts seem to have the better of the arguments. It can scarcely be contended that there is enough scientific agreement to warrant judicial notice that addiction in and of itself usually affects credibility. Certainly it is pregnant with prejudice. On the other hand, there is an increasing recognition among non-legal authorities that addiction may in various instances be linked with personality and other defects which do bear upon credibility." (Footnotes omitted.)

to prejudice the defendant in the eyes of jurors. I would exclude all such evidence for the purposes of character impeachment, unless: (1) expert testimony establishes a probable effect upon a witness' capacity for truthtelling, *accord, Fields v. State,* 487 P.2d 831 (Alas. 1971); *People v. Ortega,* 2 Cal. App. 3d 884, 83 Cal. Rptr. 260 (1969), or; (2) some relevance is established involving the witness' credibility in the matter being litigated.

## THE CRIME OF AIDING AND ABETTING

Copetitioner Milton LaVanway assigns error to jury instruction No. 10 delineating the elements of the offense, or charge of aiding and abetting.[5] The instruction to which he objects is substantially based upon RCW 9.01.030. He contends that the bare language of jury instruction No. 10 failed to convey the requirement that an overt act is required as a necessary element of the offense of aiding and abetting a grand larceny. Thus, contends the petitioner, the jury was able to bring in its verdict based only upon Milton's presence at the restaurant. To remedy this deficiency, counsel for the defense offered its proposed jury instruction No. 2[6] which is couched in the language of our decision in

---

[5] Jury instruction No. 10

"You are instructed that every person concerned in the commission of grand larceny, whether he directly or indirectly commits the acts constituting the offense or aids or abets in the commission, is guilty of grand larceny.

"Thus, the act of one individual among several who are present at the scene and participate in grand larceny, would be the acts of each and all, as a principal, whether each of them took, stole, or carried away the property or not. For a person to be an aider or abettor by his presence, he must be ready to assist, ready to render assistance should it become necessary, or must assist the perpetrator of the crime by his presence.

"You are further instructed that to aid and abet may consist of words spoken, or acts done, for the purpose of assisting in the commission of a crime or of counseling, encouraging, commanding or inducing its commission. To constitute an aider or abettor, it is essential that the aider or abettor should share the criminal intent of the person or party who committed the offense."

[6] Defendant's proposed jury instruction No. 2. "It is provided by statute that every person concerned in the commission of a felony, gross misdemeanor or misdemeanor, whether he directly commits the act

*State v. Peasley,* 80 Wash. 99, 141 P. 316 (1914), and clearly sets forth the requirement of an overt act. As stated in *State v. Catterall,* 5 Wn. App. 373, 379, 486 P.2d 1167 (1971), "mere physical presence and assent to the commission of the crime is not enough to constitute one an aider or abettor of the principal commiting the crime." If I may interpolate the language of our recent unanimous decision in *State v. Walker,* 82 Wn.2d 851, 857, 514 P.2d 919 (1973), *Peasley* was controlling law at the time of trial, and La-Vanway's proposed jury instruction which set forth the *Peasley* holding should have been given to the jury. Hence, the rejection of the jury instruction incorporating a proper statement of the law was error.

I would remand this case for a new trial consistent with the views expressed in this dissent.

ROSELLINI and UTTER, JJ., concur with FINLEY, J.

---

constituting the offense, or aids or abets in the commission, and whether present or absent; and every person who directly or indirectly counsels, encourages, hires, commands, induces or otherwise procures another to commit a felony, gross misdemeanor or misdemeanor, is a principal. There must be some overt act, the doing or saying of something, directly or indirectly contributing to a criminal act, and mere assent to a criminal act is insufficient."