[Nos. 4346–1–III; 4487–4–III. Division Three. July 6, 1982.]

THE STATE OF WASHINGTON, *Respondent,* v. FRANCIS KEITH BRUSH, *Appellant.*

*Charles K. Wiggins, Malcolm L. Edwards,* and *Edwards & Barbieri,* for appellant.

*Joseph Panattoni, Prosecuting Attorney,* for respondent.

McINTURFF, C.J.—Francis Brush appeals his jury conviction of first degree arson. He contends the prosecutor's use of a 14–year–old conviction for second degree burglary is reversible error. We disagree and affirm.

Mr. Brush was the fire marshal and building inspector of Kittitas County. During the late summer of 1979, he lived in a rural house located 4½ miles from Ellensburg with his son and his son's friend, Douglas Burrows. Mr. Brush was experiencing financial difficulties and was not only delinquent in his house payments but also in payments on another house in Seattle, payments on a credit card and a bank note. His creditors made collection calls, but no lawsuits or foreclosure proceedings had been commenced. Mr. Brush had listed both his present home and the Seattle property for sale.[1] The Ellensburg home was a popular list-

---

[1] Mr. Brush's home, with 5.75 acres of land, was listed for sale at $63,000. The property was sold "as is" in June 1980, 9 months after the fire, for $57,000. The purchaser described the condition of the house after the fire:

At the time I purchased the home the back porch was burned off it. The kitchen was completely gutted and the entire house was smoke damaged. It was a mess.

ing among the local real estate community and Mr. Brush had received several offers on the property.

On September 25, 1979, Mr. Brush was home alone when a real estate agent showed his house to an interested couple. They completed their tour around 8 p.m. and spent approximately 10 minutes outside the home before leaving. During this time, Mr. Brush received a telephone call from a party who had previously agreed to purchase approximately 8 acres of his adjacent land. This caller informed Mr. Brush that she and her husband had decided not to purchase the property. The realtor and her clients left the property at 8:10 p.m. Mr. Brush, along with his dog, left minutes later. Shortly thereafter, a neighbor spotted a fire at the Brush house and called the fire station. The fire trucks arrived minutes later and the fire was quickly extinguished. The back porch and kitchen suffered extensive fire damage. There was smoke damage throughout the remainder of the house.

The state fire marshal's office investigated the fire and determined it to have been an incendiary–type fire set by spreading a flammable liquid on the back porch. The state crime laboratory discovered traces of charcoal starter fluid on samples of the charred floor and soil residue taken from beneath the porch.

The State immediately suspected arson and theorized the fire had been set by Mr. Brush to collect the proceeds of his fire insurance policy. In July 1979, Mr. Brush had raised the amount of this insurance coverage from $56,600 to $66,000. Other circumstantial evidence relied on by the State in support of its theory was the telephone conversation concerning the land sale, the lack of furnishings in the house, and the fact Mr. Brush took his dog with him when he left the house, since he allegedly knew the house was going to burn.

The defense presented evidence of Mr. Brush's solvency, his employment background, and his credit worthiness. He testified that his Seattle house sold in December 1979; that the proceeds were used to pay his outstanding bills, and

that his insurance had been raised to adequately reflect the true replacement cost of his house. In addition, he said his dog was taken with him on the night of the fire because the dog always accompanied him.

Prior to trial, a motion in limine was granted with regard to the prosecution's use of a prior conviction. In 1966, Mr. Brush, at age 21, pleaded guilty to second degree burglary. He paid restitution and in 1969, following the successful completion of a probationary period, an order was entered pursuant to the deferred prosecution statute, RCW 9.95-.240, which dismissed the charge.

At the close of the defense's case in chief, the prosecution, contending the defense had presented evidence of Mr. Brush's good character, moved to use the 14–year–old conviction in rebuttal. The trial judge determined Mr. Brush had placed his character in issue and allowed the prosecution to use the prior conviction to rebut evidence of Mr. Brush's good character.

■ The long–standing rule in this state is that a criminal defendant who places his character in issue by testifying as to his own past good behavior may be cross–examined as to specific acts of misconduct unrelated to the crime charged. *State v. Renneberg,* 83 Wn.2d 735, 738, 522 P.2d 835 (1974); *State v. Studebaker,* 67 Wn.2d 980, 986, 410 P.2d 913 (1966); *State v. Emmanuel,* 42 Wn.2d 1, 14, 253 P.2d 386 (1953); *State v. Ternan,* 32 Wn.2d 584, 591, 203 P.2d 342 (1949).

The rationale underlying this "open door" policy was expressed in *Michelson v. United States,* 335 U.S. 469, 479, 93 L. Ed. 168, 69 S. Ct. 213, 220 (1948):

> The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him.

Mr. Brush contends the adoption of the Rules of Evidence[2] precludes the use of the "open door" policy of

---

[2]The Rules of Evidence were adopted April 2, 1979, *see* 91 Wn.2d 1117 (1979).

*State v. Renneberg, supra,* and thus, the prior conviction is not admissible under ER 609, ER 608, ER 404, or ER 403.[3]

---

[3]ER 609 provides in pertinent part:

"(a) . . . For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross–examination but only if the crime (1) was punishable by death or imprisonment in excess of 1 year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment.

"(b) . . . Evidence of a conviction under this rule is not admissible if a period of more than 10 years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than 10 years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to . . ."

ER 608 provides in pertinent part:

"(a) . . . The credibility of a witness may be attacked or supported by evidence in the form of reputation, but subject to the limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by reputation evidence or otherwise.

"(b) . . . Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross–examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross–examined has testified."

ER 404 provides in pertinent part:

"(a) . . . Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

"(1) . . . Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;

" . . .

"(b) . . . Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

ER 403 provides in pertinent part:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

As a general proposition, the Rules of Evidence govern the admissibility of evidence and supersede conflicting statutory and judicially created law. ER 101; ER 1101; Orland & Tegland, *The Federal Rules of Evidence: Washington Follows the Federal Model*, 15 Gonz. L. Rev. 277, 282 (1980) (hereinafter cited as Orland & Tegland).[4] The "open door" policy of *State v. Renneberg* is not in conflict with the Rules of Evidence. In fact, ER 404(a)(1) has incorporated the *Renneberg* policy.

Rule 404(a)(1) allows evidence of a pertinent character trait of the accused to be admitted when offered by the accused. Additionally the prosecution may offer character evidence of the accused to rebut such evidence introduced by the accused. The rule embodies traditional doctrine. [Footnote citing *Michelson v. United States, supra.*] *The defendant does not open the door to rebuttal character evidence simply by taking the stand. To open the door, the defendant, or a witness brought forward by the defendant, must first testify to a trait of character.*

(Footnotes omitted. Italics ours.) Orland & Tegland, *supra* at 308.

The distinction between rebuttal character evidence admitted under the "open door" policy and character evidence generally is discussed in E. Cleary, *McCormick on Evidence* § 191 (2d ed. Supp. 1978):

Ordinarily, when courts speak of an accused's putting his character in issue, it is assumed that the means by which he does so is introducing witnesses who testify to his good character in terms of reputation, or, more currently, opinion. *Note should be taken, however, that by relating a personal history supportive of good character, defend-*

---

misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

[4]Exceptions to this general rule which are not applicable to the instant facts are set forth in ER 1101(c). Also, overriding constitutional doctrines such as the privilege against self-incrimination, the Fourth Amendment exclusionary rule, or the admissibility of confessions may, in a given instance, be controlling. Orland & Tegland, *supra*.

*ant may be opening the door to rebuttal evidence along the same line.*

(Footnotes omitted. Italics ours.) *See United States ex rel. Johnson v. Johnson,* 531 F.2d 169, 175–76 (3d Cir. 1976); *see generally People v. Ogg,* 258 Cal. App. 2d 841, 66 Cal. Rptr. 289 (1968); *State v. Hale,* 21 Ohio App. 2d 207, 256 N.E.2d 239, 244–45 (1969).

In *United States v. Johnson,* 542 F.2d 230, 234–35 (5th Cir. 1976), the defendant sought to exclude a prior conviction on the basis that it was more than 10 years old:

> Johnson contends, however, that at least with respect to his 1958 felony conviction, the impeachment use of the evidence was barred by Rule 609(b) of the Federal Rules of Evidence, which creates in effect a rebuttable presumption that convictions over ten years old are more prejudicial than helpful and should be excluded. We do not believe Rule 609 was meant to cover this particular species of impeachment use of a prior conviction. Rule 609 was crafted to apply in those cases where the conviction is offered only on the theory that people who do certain bad things are not to be trusted to tell the truth. Here the evidence had a different, surer value in that it directly contradicted the position taken by the witness.

(Footnotes omitted.)

We do not conclude the adoption of the Rules of Evidence has superseded the "open door" policy. The policy is still the law and serves in its limited capacity to allow the prosecutor to cross–examine a defendant who, by his testimony, has placed his character in issue as to specific acts of misconduct unrelated to the crime charged.

The threshold question remains: Did the defense's case in chief place Mr. Brush's character in issue? The State contends the testimony given by Mr. Brush and other defense witnesses more than justifies the State's right to use the prior conviction for rebuttal purposes. Mr. Brush argues his case was limited to rebutting the State's theory that he had a financial motive for arson and necessarily included testimony concerning his solvency, credit worthiness and employment history.

The defense presented testimony that Mr. Brush served as the county fire marshal and building inspector and had worked on several controversial issues such as the fire code amendments, the floodplain, the Snoqualmie Pass non-growth policy, and the closure of the Cle Elum gymnasium. A newspaper article was admitted which contained a picture of Mr. Brush and others on the jobsite of a new medical clinic in Cle Elum. At the time the photograph was taken, Mr. Brush was employed by a local architectural firm.[5] Mr. Brush testified to his extensive property dealings, his involvement in the construction industry as both a journeyman carpenter and a contractor, his financial dealings including salary, debts, prior bankruptcy, and credit history. Testimony was given regarding his duties and responsibilities as fire marshal and building inspector.[6] Mr. Brush also testified concerning the training received while employed by the County. He said he attended workshops, fire demonstrations and a fire chief's conference.

■ The trial judge allowed the parties to present extensive argument on the issue of whether the prior conviction

---

[5]The newspaper clipping also pictured Mr. Brush's dog with him on the jobsite. This exhibit is illustrative of the parties' differing contentions. The State contends the clipping was laudatory of the defendant and his work which associated him with the construction of a medical clinic which serves to bring medical services to an outlying community. The defense argues this story was offered to bolster Mr. Brush's explanation that he took his dog with him wherever he went.

[6]Billie Barrett, Mr. Brush's secretary while he was employed by the County, gave the following testimony in response to defense counsel's questions:

"Q. What were the natures [sic] of Mr. Brushes [sic] duties when you were his secretary, Mrs. Barrett?

"A. He did plan checking and inspected all the on–site buildings in the county, investigated fires, even went so far as to fight a fire himself once that was in kind of a no man's land.

"Q. Where was that?

"A. It was out east of town. It wasn't in any district. It was caused by the Milwaukee Railroad or something and so he got some equipment and some of the county road crew to help fight the fire.

"Q. Did he spend a lot of time in the office?

"A. Very little time in the office.

"Q. His duties encompassed all of Kittitas County?

"A. Yes, they did."

should be admitted. Moreover, he viewed the witnesses, heard the testimony firsthand, and went to commendable lengths in exercising his discretion[7] before determining that Mr. Brush had placed his character in issue. Under these circumstances, we find the trial court did not abuse its discretion in allowing the prosecution to use the prior conviction for rebuttal purposes.[8]

The remaining assignments of error pertain to the prosecution's theory and subsequent use at trial of testimony that Mr. Brush submitted a fraudulent claim to his insurance company for the loss of two shotguns and a rifle. Mr. Brush submitted a claim for the theft of the three weapons from his home on May 18, 1979, 5 months prior to the fire.

---

[7]The trial judge made the following comments in ruling on the prosecutor's motion to use the prior conviction: "our distinguished, now deceased, justice of our state supreme court, Mr. Justice Finley, . . . said that it is like the situation of residing in the desert where the camel once begins to put its nose under the tent. It is rather difficult to hide the rest of the body of the camel. And the Court feels that from the evidence, . . . the price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has closed for his benefit and to make himself vulnerable where the law otherwise shields him.

". . .

". . . It is a judgment call for a public official whether or not they want to, as it were, open the Pandora's box with reference to the quality of their work and the rest of these type things. This is true. A very serious question.

"But I do feel in this case and I say, it is a matter of a long series of financial documents where, well, now into Exhibit 60, the defendant has very definitely put in issue his character with reference to his promptness for paying of bills, his financial status, quality now of his performance in contracting, the matters generally which relate to matters of character.

". . .

". . . The defendant puts his own prior conduct in issue by testifying to good behavior. He may be cross examined on specific acts of his conduct even unrelated. So I am going to permit the prior conviction to be inquired into on cross examination.

". . .

"I am going to let it in. It's a very, very close question, but I am going to let it in as I ruled yesterday. Bring in the jury."

[8]Because we find no abuse of discretion and since we conclude the policy behind the *Renneberg* decision is applicable to the facts presented on this appeal, we need not address Mr. Brush's remaining arguments which generally pertain to the Rules of Evidence.

When he submitted the claim, he was not living at the house as his former wife still lived there. His insurance agent informed him that additional information concerning the valuation and description of the weapons and a report of the loss to the sheriff's department was needed prior to the claim being processed. This information was not supplied until March 1980, 6 months after the fire. The claim was then processed and Mr. Brush was paid $364.19 on April 21, 1980.

At trial, Mr. Brush was asked on cross examination whether the three weapons which he had previously reported as stolen were at his home on the night of the fire. He testified they were not. The prosecution called Marvin Henneke, a deputy sheriff, as a rebuttal witness. Officer Henneke testified that on the night of the fire he saw three weapons lying on the grass in the front yard of the Brush home. He identified the weapons as two shotguns and a .22 caliber rifle. Officer Henneke stated that he asked Mr. Brush who the weapons belonged to and that Mr. Brush stated they were his, picked them up and placed them in his vehicle. This testimony was not objected to by the defense. Officer Henneke's recollection of the evening had been memorialized in a statement dated March 6, 1980. A copy of this statement was not provided to defense counsel prior to its use.

Mr. Brush first contends the prosecutor's failure to disclose Officer Henneke's March 7, 1980 statement, pursuant to the discovery provisions of CrR 4.7, denied him his constitutional right to a fair trial. CrR 4.7 provides in pertinent part:

**(a) Prosecutor's Obligations.**
(1) . . . the prosecuting attorney shall disclose to the defendant the following material and information within his possession or control no later than the omnibus hearing:
(i) The names and addresses of persons whom the prosecuting attorney intends to call as witnesses at the hearing or trial, together with any written or recorded statements and the substance of any oral statements of

such witnesses;

. . .

(4) The prosecuting attorney's obligation under this section is limited to material and information within the knowledge, possession or control of members of his staff.

. . .

(h) . . .

. . .

(2) *Continuing duty to disclose.* If, after compliance with these standards or orders pursuant thereto, a party discovers additional material or information which is subject to disclosure, he shall promptly notify the other party or his counsel of the existence of such additional material, and if the additional material or information is discovered during trial, the court shall also be notified.

 Officer Henneke was first called to testify in the prosecution's case in chief. Although the record is unclear as to how long the prosecutor had actual possession of the statement, it is clear it was in his possession for at least several days prior to giving it to defense counsel. CrR 4.7 directs the prosecuting attorney to disclose to the defendant any written or recorded statements made by a person whom the prosecuting attorney intends to call as a witness. *State v. DeWilde,* 12 Wn. App. 255, 258, 529 P.2d 878 (1974).

If the State gathers evidence during trial which it intends to use in rebuttal, it must furnish such statements to the defense. *State v. Harris,* 14 Wn. App. 414, 420, 542 P.2d 122 (1975). The prosecuting attorney has a continuing duty to promptly furnish such evidence to the defense at the moment of discovery or confirmation, even when such occurs during trial. *State v. Oughton,* 26 Wn. App. 74, 79, 612 P.2d 812 (1980); *State v. Falk,* 17 Wn. App. 905, 908, 567 P.2d 235 (1977).

 The potential prejudice resulting from the prosecutor's noncompliance with the discovery rules lies in defendant's inability to properly anticipate and prepare, *i.e.,* surprise. Sanctions for the prosecutor's noncompliance with the discovery rules are set forth in CrR 4.7(h)(7)(i):

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto, the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, dismiss the action or enter such other order as it deems just under the circumstances.

These sanctions do not include the suppression of the statement. *State v. Stamm,* 16 Wn. App. 603, 610, 559 P.2d 1 (1976); *State v. Glasper,* 12 Wn. App. 36, 38, 527 P.2d 1127 (1974). Defense counsel did not object to Officer Henneke's testimony. The appropriate remedy would have been to object and request a continuance or a delay of the trial. *See State v. Harris, supra* at 420. Instead, defense counsel moved for a mistrial. Upon denial of that motion, defense counsel proceeded to present his own rebuttal evidence. Mr. Brush, his son, and Mr. Burrows all testified the weapons seen by Officer Henneke belonged to Mr. Burrows and were not the ones which had been reported stolen.

The prosecutor's failure to promptly provide defense counsel with Officer Henneke's statement was error. However, such error is reversible only when it is prejudicial. A prejudicial error is one which affects or presumptively affects the final result of the trial. *State v. Martin,* 73 Wn.2d 616, 627, 440 P.2d 429, *cert. denied,* 393 U.S. 1081 (1968). Because the available remedy was the granting of a continuance and since defense counsel did not move for such a continuance, the prosecutor's noncompliance with the discovery rule was not prejudicial error.

The last assignment of error also involves the allegedly fraudulent insurance claim. Mr. Brush contends the insurance claim was a collateral matter, immaterial, highly prejudicial, and irrelevant under any theory of the case. Defense counsel did not object to the admission of this evidence.

■ Generally, the failure to object at trial will operate as a waiver of the right to assert that error on appeal. *State v. Fagalde,* 85 Wn.2d 730, 731, 539 P.2d 86 (1975). An

established exception to this general rule exists when there is a "manifest error affecting a constitutional right." RAP 2.5(a)(3). Mr. Brush argues the admission of this evidence denied him his constitutional right to a fair trial which allows him to raise the issue for the first time on appeal. This argument is not persuasive due to his failure to demonstrate how the admission of this testimony was so prejudicial as to deny him a fair trial. Our independent examination also fails to disclose the requisite constitutional error. The failure to object to this testimony effectively waived his right to raise it on appeal.

The judgment of the Superior Court is affirmed.

MUNSON and ROE, JJ., concur.

Reconsideration denied August 16, 1982.

Review denied by Supreme Court January 20, 1983.