68 P.3d 1078 (2002)
STATE of Washington, Respondent,
v.
Michael Vittorio CAFFEE, Defendant,
Shelton Ramsey MUSGRAVE, Appellant, and
Jay Stewart, and each of them, Defendant.
In the Matter of the Postsentence Review of Shelton Ramsey Musgrave.
State of Washington, Appellant,
v.
Shelton Ramsey Musgrave, Respondent.
Nos. 47512-6-I, 47920-2-I.
Court of Appeals of Washington, Division 1.
November 25, 2002.
As Amended and Publication Ordered in Part April 15, 2003.
Review Denied July 8, 2003.
*1079 Jeffrey E. Ellis, Seattle Public Defender, Seattle, WA, for Appellant.
Donna H. Mullen, Attorney General's Office, Olympia, WA, for Petitioner.
Deborah A. Dwyer, King Co. Pros Ofc/Appellate Unit, Seattle, WA, for Respondent, State of Washington.
GROSSE, J.

OPINION
Disparate sentences between codefendants satisfy rational basis analysis of equal protection where one defendant pleads guilty to a lesser crime and cooperates with police, while a second codefendant is convicted at trial of a more serious offense. Thus, the trial court erred in this case when it concluded that there was no rational basis for the differences in the sentences of Shelton Musgrave and Jay Stewart. Musgrave's conviction is affirmed; the case is remanded for resentencing.

FACTS
On August 9, 1999, Shelton Musgrave, Jay Stewart, and Michael Caffee were under a freeway overpass near Green Lake in Seattle *1080 when a homeless man named David Ballenger was killed. The State charged Musgrave, Stewart, and Caffee with second degree murder, but indicated it would amend the information to charge first degree murder with a deadly weapon if the defendants went to trial.
Stewart cooperated with police officers and pleaded guilty to second degree murder, receiving 204 months, within the standard range for second degree murder. Musgrave decided to go to trial and was charged with murder in the first degree with a deadly weapon enhancement, as well as the lesser included crimes of second degree murder, and first and second degree manslaughter. Caffee agreed to plead guilty to first degree manslaughter in return for his testimony at Musgrave's trial.
Caffee was the only eyewitness who testified at Musgrave's trial and provided the following version of events:
On August 9, 1999, Will Allison and Jay Stewart visited Shelton Musgrave at his apartment in Seattle. The three drank a case of beer. The young men then went to Green Lake where they joined up with Caffee.
David Ballenger, a homeless man known to both Caffee and Musgrave, arrived where the other men were located. Stewart started to argue with Ballenger. Both Allison and Stewart then struck Ballenger. Neither Musgrave nor Caffee participated in this initial assault. Allison left and attempted to lead Stewart away, but Stewart ran back to find Ballenger and began kicking and hitting Ballenger.
When a bystander who saw the assault picked up a nearby pay phone, Stewart, Caffee, and Musgrave all yelled at the bystander to hang up the phone. Caffee threatened to beat up the bystander, and Musgrave advised the bystander to leave. The man left, but by then Ballenger had escaped. Police officers arrived and asked the three individuals if they knew anything about a fight. Stewart, Caffee, and Musgrave denied knowledge or participation.
Stewart demanded to know where Ballenger was, and Musgrave eventually led Stewart and Caffee to the freeway overpass where Ballenger made his "camp." Stewart began choking and hitting Ballenger. Musgrave then began kicking Ballenger from behind. Stewart approached Caffee and demanded Caffee's knife. Caffee gave it to him only after repeated requests. Stewart used the knife to stab Ballenger and Musgrave used the knife to cut off Ballenger's sweater. Stewart set Ballenger's sweater on fire and threw it into Ballenger's bedding. Caffee testified Ballenger made a sound that Caffee described as lungs "deflating." Caffee stated he thought Ballenger was dead, but that Musgrave continued to stab Ballenger.
Throughout his testimony, Caffee described his role in Ballenger's death as a reluctant bystander. Caffee explained that during the events he was standing near a freeway support pillar and away from the others, who were under the overpass, watching as the events unfolded. Caffee also testified that he moved around during the events, from behind the pillar to a fence near the overpass, and that Stewart and Musgrave moved around as they attacked Ballenger. After the attack, Stewart returned the knife to Caffee, and Caffee placed the knife in his back pocket. Stewart, Musgrave, and Caffee then left and went back to Musgrave's apartment. Caffee testified that both Stewart and Musgrave threatened to kill anyone who told anyone what happened. Caffee said he watched the fire from a parking lot two blocks away from the overpass.
Caffee testified that he pretended to discover Ballenger's body the next day. Police officers were called, and when they arrived Caffee denied any participation in the crime. Caffee was later interviewed and he again denied participation in the crime. Caffee later admitted to police officers that he was present when Ballenger was killed, but stated that Stewart and Musgrave were the primary aggressors.
At trial, a medical examiner testified that Ballenger had suffered 18 stab wounds as well as 5 rib fractures that could have been inflicted by a forceful kick with a heavy boot. The State also introduced into evidence Musgrave's steel-toed boots, which had blood matching Ballenger's DNA (deoxyribonucleic *1081 acid) profile on them. Musgrave's left boot exhibited an airborne pattern of droplets, while his right boot contained a blood stain diffused over a large area that was consistent with a contact transfer. The patterns of blood on the boots suggested that the right boot forcefully came into contact with the blood source and that the left boot was close to the vicinity where the impact with the blood source occurred. Blood consistent with Ballenger's DNA profile was also found on Caffee's left rear pants pocket.
In pretrial motions, Musgrave moved to suppress evidence seized from his apartment pursuant to a search warrant. The search was conducted August 12, 1999. The affidavit in support of the search warrant was dated August 12, 1999, but the warrant was dated August 13, 1999. The State maintained that the warrant had been signed by the judge in his chambers on August 12, 1999, along with the affidavit, prior to the search. Because the judge who signed and dated the warrant and affidavit was then deceased, the court agreed to hear testimony from detectives and the deputy prosecuting attorney.
King County Senior Deputy Prosecuting Attorney Barbara Flemming and Detective Kilburg testified they prepared the search warrant and accompanying affidavit and that the judge signed the warrant and affidavit in their presence on the afternoon of August 12, 1999. Detective Kilburg and Detective Ninomiya testified that the warrant was served and the search was conducted on the afternoon of August 12, 1999. The court concluded the affidavit indicated a date that was "probably most persuasive" and that the warrant and subsequent search were valid. The court entered findings of fact and conclusions of law that although the warrant was dated August 13, 1999, it was actually signed by the judge on August 12, 1999.
Also prior to trial, both State and defense attorneys noted that neither Musgrave nor Caffee had prior criminal convictions and agreed not to introduce evidence of either of the defendants' "teenage history" of "potentially illegal or inappropriate" acts under ER 404(b). Musgrave's attorney stated that if Caffee opened the door in some obvious way, such as stating, "I've never had contact with the police" or "I've never been in trouble before," she would seek to introduce such evidence of inappropriate acts on the issue of Caffee's credibility. The State commented that it was unaware of any acts by Caffee other than smoking cigarettes at school; possibly writing his name in cement; or bragging with Musgrave about "macing bums," and asked for an offer of proof about other acts. Defense counsel replied that it was premature and the court agreed.
During the course of Caffee's direct examination, after he testified about how he had initially lied to police officers, the prosecutor asked Caffee how he felt about talking to police officers about the murder. Caffee responded:
I was still pretty scared. I don't know, I've never had any real, like, connection with the law before. I've never made anydone anything seriously legal [sic] to get me in trouble, so I've never dealt with the police in a situation like this. And I was, like, kind of scared of what could happen.
Caffee then admitted that he also lied to police officers when they interviewed him at the police station, stating several times that he was trying to be "loyal" to his friend Musgrave.
Four days after Caffee's comments, Musgrave's counsel argued that Caffee's testimony was a "material misrepresentation," and that Caffee had opened the door to impeach the impression that he was a naïve, frightened young man who didn't have the experience to lie to police officers. Defense counsel stated that Caffee had been arrested and questioned for prowling around bikes; stealing bike parts; graffiti; possession of illegal fireworks; and smoking marijuana in public. The State countered that Caffee qualified his testimony and noted that the State did not have any record of Caffee's alleged prior contacts with law enforcement. The court did not allow admission of evidence of prior conduct, stating that the defense had "full and adequate opportunity" to impeach Caffee regarding his fabrications and would continue to have opportunities to impeach Caffee *1082 about his misrepresentations to police officers.
After Caffee finished testifying, defense counsel also sought to introduce testimony and photographs by a defense investigator. Defense argued the purpose of the testimony and photographs was to impeach Caffee's testimony regarding his version of events by showing that Caffee could not have seen what he claimed to have seen from his vantage point. The trial court stated that it would not allow the testimony or photographs, but offered to allow the defense an opportunity to lay a foundation for the introduction of the photographs by recalling Caffee to the stand to determine if they were accurate representations of where he was standing and what he saw. Defense counsel declined to do so and did not further discuss the issue.
At the conclusion of the trial, the court submitted the following jury instruction for accomplice liability:
A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he or she either:
(1) solicits, commands, encourages, or requests another person to commit the crime; or
(2) aids or agrees to aid another person in planning or committing the crime.
The word "aid" means all assistance whether given by words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.[[1]]
The court denied the following jury instructions proposed by Musgrave, finding that the first was "a restatement" of the last sentence of the given jury instruction and that the second was "very confusing":

No. ______
It is not enough that the defendant merely associated with the person(s) committing the crime, or unknowingly or unintentionally did things that were helpful to that person(s), or was present at the scene of the crime.

No. ______
In order to find the defendant guilty of Murder in the First Degree, the evidence must show beyond a reasonable doubt that the defendant knowingly helped another person(s) commit Murder in the First Degree.
After the State's closing argument, the defense renewed its request for its proposed jury instructions arguing that the prosecutor's comments had confused the jury and that the proposed instructions would clarify the law of accomplice liability. The court denied the request.
Musgrave was convicted of first decree murder with a deadly weapon enhancement. The defense recognized that the conviction carried a mandatory standard sentencing range of 264 months, but urged the court to depart from the sentence to protect Musgrave's equal protection rights. The sentencing judge concluded that all defendants were equally culpable in the crime. Thus, the judge determined that sentencing Musgrave to 264 months while Stewart only received 204 months would deny Musgrave equal protection of the law because the disparate sentence was based solely on the fact that Musgrave exercised his right to trial while Stewart pleaded guilty. The court held that this result was required not only by constitutional considerations, but also by the provisions of the Sentencing Reform Act of 1981(SRA), chapter 9.94A RCW. Musgrave received 199 months in prison.
Musgrave appeals the trial court's accomplice liability instruction and the denial of his proposed instructions, as well as other issues regarding the scope of cross examination, exclusion of testimony and photographic evidence, and the validity of the initial search warrant. The State appeals Musgrave's sentence *1083 as below the statutory minimum. The appeal is timely.

DISCUSSION
1. Musgrave's Sentence Below Statutory Minimum.
Under the equal protection clause of the fourteenth amendment of the United States Constitution, and article I, section 12 of the Washington Constitution, "persons similarly situated with respect to the legitimate purpose of the law must receive like treatment."[2] Where codefendants have received different sentences, a court will exercise equal protection analysis only after a defendant "can establish that he or she is similarly situated with another defendant by virtue of near identical participation in the same set of criminal circumstances[.]"[3] "Then, only if there is no rational basis for the differentiation among the various class members will a reviewing court find an equal protection violation."[4]
Because the State argued at the sentencing hearing that equal protection was not violated by treating Musgrave and Stewart differently in sentencing, it has not waived the right to contest the trial court's findings.[5] Further, the State concedes, and State v. Handley establishes, that Stewart and Musgrave are similarly situated for purposes of the first step in equal protection analysis, i.e., they are members of the same class.[6]
First, Musgrave's situation is factually different from many of the cases that address disparate sentences between codefendants; these cases involve individuals who are charged with and convicted of the same offense, but nonetheless receive different sentences.[7] For example, the court in State v. Clinton remanded the matter for resentencing where two defendants who were charged and convicted of the same crimes were nonetheless sentenced differently.[8] Here, Stewart was convicted of murder in the second degree while Musgrave was convicted of murder in the first degree.[9]
Second, even where codefendants are convicted of the same or similar crimes, a trial court is justified in imposing disparate sentences based on relative culpability, criminal record, rehabilitation potential, cooperation with law enforcement, and differences in pleas.[10] "`Relevant distinctions need not pertain only to the codefendants' relative culpability or to the pleas to which they agreed, but may pertain to anything which provides a rational basis for the disparate sentences.'"[11] Thus, in State v. Turner, where one defendant in a robbery received only a suspended sentence of one year in jail and the second defendant received multiple consecutive 25-year terms, a rational basis for the difference in treatment was supported by the facts that the first defendant pleaded guilty to charges in exchange for trial testimony and the other was convicted of more serious offenses by a jury, had previous convictions, and was found to have acted more aggressively during the robbery.[12]
*1084 Here, there is a rational basis for the different treatment between Musgrave and Stewart. The difference in treatment was not based solely on Musgrave's choice to exercise his right to trial. Stewart chose to plead guilty for a reduced sentence, thus agreeing to cooperate with police officers. Musgrave was convicted by a jury of a higher crime than Stewart. The jury could have found him guilty of lesser included offenses or not guilty. The fact that the jury found Musgrave guilty of first degree murder is, by itself, a rational basis to justify imposition of a higher statutory penalty on him.
Further, Musgrave's different sentence conforms to the purposes of the SRA because he received a sentence commensurate with the punishment of others who are convicted of the crime of murder in the first degree. The SRA is designed to "[e]nsure that the punishment for a criminal offense is proportionate to the seriousness of the offense and the offender's criminal history[,]" and to ensure that sentences are "commensurate with the punishment imposed on others committing similar offenses[.]"[13] The purposes of the SRA reveal a rational basis for different sentences for conviction of different crimes.[14]
Because there is a rational basis for the differing treatment of Musgrave and Stewart, the trial court erred in finding that imposing a mandatory sentence violated Musgrave's equal protection rights. Since the trial court abused its discretion in imposing a sentence below the statutory range, this case should be remanded for sentencing consistent with RCW 9.94A.120, RCW 9.94A.310, and RCW 9.94A.320.
The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with rules governing unpublished Opinions.
COLEMAN, J., and BAKER, J., concur.
NOTES
[1] Jury instruction 10.
[2] State v. Manussier, 129 Wash.2d 652, 672, 921 P.2d 473 (1996) (citation omitted).
[3] State v. Handley, 115 Wash.2d 275, 290, 796 P.2d 1266 (1990) (an equal protection class of codefendants is established in the rare case where the co-defendants were at the scene of the offense and were charged with many of the same crimes).
[4] Handley, 115 Wash.2d at 290, 796 P.2d 1266.
[5] State v. Brush, 32 Wash.App. 445, 648 P.2d 897 (1982).
[6] Handley, 115 Wash.2d at 291, 796 P.2d 1266.
[7] State v. Clinton, 48 Wash.App. 671, 741 P.2d 52 (1987); State v. Portnoy, 43 Wash.App. 455, 718 P.2d 805 (1986); State v. Bresolin, 13 Wash.App. 386, 534 P.2d 1394 (1975).
[8] Clinton, 48 Wash.App. at 672-73, 741 P.2d 52.
[9] RCW 9.94A.120(4), .310(1), .310(4)(a), .320.
[10] State v. Conners, 90 Wash.App. 48, 52, 950 P.2d 519 (1998) (citing Handley, 115 Wash.2d at 292, 796 P.2d 1266).
[11] Handley, 115 Wash.2d at 292, 796 P.2d 1266 (quoting Clinton, 48 Wash.App. at 680, 741 P.2d 52) (emphasis added).
[12] State v. Turner, 31 Wash.App. 843, 846-48, 644 P.2d 1224 (1982). See also, State v. Hurst, 5 Wash.App. 146, 149, 486 P.2d 1136 (1971) (prior felony conviction furnishes a rational basis for differentiation in the maximum sentences).
[13] RCW 9.94A.010(1), (3).
[14] See also, State v. Skillman, 60 Wash.App. 837, 838-39, 809 P.2d 756 (1991) (trial court's sentencing authority is limited to that expressed in the SRA, citing In re Carle, 93 Wash.2d 31, 33, 604 P.2d 1293 (1980)).