# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON, )
) No. 69123-6-I
Respondent, )
) DIVISION ONE
v. )
)
ANTONIAL M. MONROE, ) UNPUBLISHED OPINION
)
Appellant. ) FILED: April 28, 2014

LAU, J. — A jury found Antonial Monroe guilty of promoting prostitution in the first degree. We conclude that the trial court did not abuse its discretion in ruling that Monroe's testimony "opened the door" to admission of his prior adult convictions and that any error in the admission of Monroe's juvenile offenses was harmless. Monroe's claims that the trial court erred in failing to investigate juror misconduct and that defense counsel was constitutionally deficient are also without merit. We therefore affirm.

## FACTS

The State charged Antonial Monroe with one count of promoting prostitution in the first degree. At trial, 21-year-old JW testified that she was three when her parents divorced. She then lived with various relatives. JW gave birth to her first child in ninth grade and dropped out of school in the eleventh grade.

In 2010, JW met a pimp named Quinton Jones. Jones eventually beat JW, threatened her and her children, and forced her to prostitute herself. After Jones was arrested, JW continued to prostitute herself for Jones and another pimp.

In September 2011, JW met a woman named Victoria Burden and moved into Burden's apartment in Renton. In October 2011, JW and Burden went to a dance club and got into a fight with some other patrons. As the women were leaving the club, Monroe approached and asked JW, who was bleeding, if she was okay. The two exchanged telephone numbers.

JW and Monroe communicated several times during the following weeks. Monroe told JW that "we could get money together, and be successful together and stuff." Report of Proceedings (June 5, 2012) (RP) at 398. A short time later, JW left Washington and worked as a prostitute in both Las Vegas and Los Angeles. JW remained in contact with Monroe, who made it clear that he wanted her to work for him.

JW returned to Seattle around Thanksgiving 2011 and continued to work as a prostitute. After arresting one of JW's customers, police officers took her to the Genesis Project, which assists victims of sex trafficking. The Genesis Project helped JW move to the Dream Center in Los Angeles for further assistance.

In February 2012, JW returned to Washington and moved in again with Burden in Renton. After a few weeks, JW got into an argument with Burden and contacted Monroe for assistance. Monroe picked up JW and took her to the house in Kirkland where he was living. While staying in Kirkland, JW began "walking" for Monroe. RP (June 5, 2012) at 413. Monroe drove JW from Kirkland to Highway 99, dropped her off,

and then picked her up when she was done. Using Monroe's credit card, JW posted advertisements on an escort website.

After several days in Kirkland, Monroe and JW moved to the Golden West Motel on Highway 99 in Edmonds, where JW continued to work for Monroe. Monroe told JW that she was "his girl" and was supposed to do what he wanted. RP (June 5, 2012) at 430. JW testified that although Monroe never beat her, he threatened her, became angry and loud, and ripped her jacket. JW gave all of the money that she earned to Monroe.

On March 14, 2012, after spending about two weeks with Monroe, JW called Kyla Conlee at the Dream Center in Los Angeles. JW, who was crying and scared, told Conlee where she was staying and asked for help. Conlee said that she would arrange for assistance. Conlee contacted the Genesis Project, who contacted FBI Agent Steven Vienneau, who worked with agencies assisting victims of human trafficking.

Later that day, Monroe brought two other women to stay with JW at the motel. Monroe had sex with one of the women. He then drove off with the two women, leaving JW at the motel. While he was gone, JW sent a text message to Monroe, warning him not to return to the motel because the police were there. Agent Vienneau, who knew JW from the investigation of Quinton Jones, arranged for task force members to arrest Monroe as he returned to the Golden West Motel.

Monroe testified that he never asked JW to "walk" for him and denied that she used their room at the Golden West Motel for prostitution or that she ever gave him money. He also denied threatening her or asking her to be his "bottom bitch," the woman in charge of his other prostitutes. RP (June 6, 2012) at 594. Monroe explained

that he was planning to make pornographic videos with the two women at the motel and that he hoped to "be big" in the video industry. RP (June 6, 2012) at 594.

Monroe claimed that when he received JW's text message warning him about the police, he became concerned that she might be committing suicide and raced back to the motel. As he arrived at the motel, the police started "coming out of the trees, the fences, everywhere with assault rifles telling us put your hands out the car." RP (June 6, 2012) at 649. The police forced Monroe to lie on the ground in a puddle before arresting him. Monroe acknowledged that he started "acting up" because he had no idea why he was being arrested. When officers refused to tell him why he was being arrested, Monroe told them, "I don't do nothing. I don't commit crimes." RP (June 6, 2012) at 652.

Prior to trial, the parties agreed that if Monroe testified, his prior convictions for second degree identity theft and giving false information to a police officer were admissible under ER 609(a)(2). After Monroe testified that "I don't commit crimes," the trial court ruled that he had opened the door to evidence of his other adult felony and misdemeanor convictions.

The jury found Monroe guilty as charged, and the court imposed a 120-month standard range sentence.

ANALYSIS

Opening the Door

Monroe contends the trial court erred in ruling that his testimony "opened the door" to the admission of his prior nondishonesty adult felony and misdemeanor convictions. He argues that his statement "I don't commit crimes" was not a general

-4-

claim of good character but indicated only that he did not understand why he was being arrested on the particular occasion.

"A party's introduction of evidence that would be inadmissible if offered by the opposing party 'opens the door' to explanation or contradiction of that evidence." State v. Ortega, 134 Wn. App. 617, 626, 142 P.3d 175 (2006). When a witness "opens the door," the opposing party may introduce prior convictions to counter assertions of a law-abiding past regardless of whether the conviction would have been admissible under ER 609. See State v. Brush, 32 Wn. App. 450, 451, 648 P.2d 897 (1982). The doctrine promotes fairness by preventing one party from bringing up a subject to gain an advantage and then barring the other party from further inquiry. State v. Avendano–Lopez, 79 Wn. App. 706, 714, 904 P.2d 324 (1995) (citing State v. Gefeller, 76 Wn.2d 449, 455, 458 P.2d 17 (1969)). We review a trial court's determination that a party has opened the door for an abuse of discretion. Ortega, 134 Wn. App. at 626.

During his direct-examination, Monroe testified that as he was returning to the Golden West Motel, the police officers suddenly came "out of the trees, the fences, everywhere with assault rifles." RP (June 6, 2012) at 649. According to Monroe, the officers then forced him to lie on the ground in a puddle, placed an assault rifle in his back, and then arrested him without providing any explanation.

Monroe acknowledged that he started "acting up" and "making obscene comments" because he did not understand why he was being arrested and the officers refused to tell him:

> I was just explaining that I don't know what I was being investigated for, so my only hints--I just left the room with females, so I don't know what I was being arrested for, so I just said, man, I don't do nothing. I was just saying <u>I don't do nothing. I don't commit crimes</u>. I just--I'm just a fuck boy. I fuck bitches. What am I being arrested for?

RP (June 6, 2012) at 651-52 (emphasis added).

At the next break, the deputy prosecutor argued that Monroe's assertion that "I don't commit crimes" opened the door to the admission of his extensive adult and juvenile criminal history. Defense counsel maintained that Monroe's comment did not open the door to prior convictions because he was merely explaining that he did not know why he was being arrested on this occasion. Counsel also noted that the jury was unlikely to understand the comment as a general denial of criminal history because Monroe had earlier admitted a conviction for "identity theft."

After considering the issue overnight and hearing additional argument, the trial court found that Monroe had attempted to create a "false impression with the jury" by "describing this over-the-top arrest process on a person who is, you know, pure as the driven snow but for this identity theft . . . ." RP (June 6, 2012) at 689. The court concluded that the testimony had opened the door to evidence of his significant criminal history. After further argument and discussion, the court ruled that the State would be able to ask Monroe about his adult felony and misdemeanor convictions without specifying the number of convictions for each type of crime.

During his direct-examination, Monroe described in detail what he perceived as an unfairly aggressive arrest process. During the course of that description, Monroe claimed, "I don't do nothing. I was just saying I don't do nothing. I don't commit crimes."

Monroe provided this characterization of himself without any reservations or limitations. Viewed in context, Monroe's statement suggested that he was generally a law-abiding citizen, despite the prior conviction for identity theft. The trial court did not abuse its discretion in concluding that Monroe had opened the door to evidence of his prior criminal history.

### Juvenile Convictions

After concluding that Monroe had opened the door to evidence of his criminal history, the trial court limited the State's questioning to Monroe's adult felonies and misdemeanors. The court explained, "I'm satisfied that that's the appropriate boundaries [adult felonies and misdemeanors] to put on it that you've put on yourself with the exception that <u>I also want to have you make no reference to the juvenile matters</u>." RP (June 6, 2012) at 702 (emphasis added). Monroe contends that the deputy prosecutor then blatantly violated the court's order by asking him about juvenile convictions and that the trial court violated his right to a fair trial by failing to rectify the misconduct.

During cross-examination, Monroe acknowledged prior adult convictions for unlawful possession of a firearm, bail jumping, and assaults, including misdemeanor assault, felony assault, and custodial assault. The deputy prosecutor then asked Monroe about convictions for arson, malicious mischief, reckless endangerment, trespass, resisting and obstructing, and harassment. Monroe denied having ever been convicted of malicious mischief and asserted that all of the remaining offenses, including arson, involved juvenile convictions. Defense counsel raised no objection.

-7-

During the next recess, in response to a question from defense counsel, the trial court confirmed that it had intended to exclude all juvenile history. Defense counsel asked for a limiting instruction. The deputy prosecutor apologized and explained that he had misunderstood the court's ruling to exclude only Monroe's juvenile felonies for robbery and taking a motor vehicle.

In considering how to address the admission of juvenile offenses, the court noted that Monroe had erroneously asserted that his arson conviction was a juvenile offense rather than an adult conviction. In addition, contrary to his testimony, Monroe informed the court that the only juvenile offenses at issue were reckless endangerment, malicious mischief, and harassment. The court found that under the circumstances, an instruction that simply directed the jury to disregard references to juvenile convictions would be misleading and inaccurate.

Defense counsel conceded that a limiting instruction "could be awkward" and declined the court's invitation to propose a limiting instruction that not only reflected the court's ruling but also corrected Monroe's erroneous characterization of his juvenile history. RP (June 7, 2012) at 742. The trial court eventually decided that it would not give a special limiting instruction on juvenile offenses and would rely solely on the pattern instruction for prior convictions admitted under ER 609.[1]

> While the Court's view was that the juvenile--the more remote in time--this will just take a second--the more remote in time the conviction, the less probative

---

[1] Instruction 6, based on 11 Washington Practice: Washington Pattern Jury Instructions: Criminal 5.05 at 172 (3d ed.) provided: "You may consider evidence that the defendant has been convicted of a crime only in deciding what weight or credibility to give to the defendant's testimony, and for no other purpose."

value it had with respect to the credibility, I agree with the State that it is--given the fact that the door was opened the way it was opened, it is--it has some probative value. I'm going to leave it to the jury with this limiting instruction, which I think covers it amply.

It is complicated by the fact that there was an assertion that the arson was a juvenile offense, the first degree arson, which is probably the most serious of the--it's the only class A felony that I think was listed, was a juvenile matter. So I'm not going to muddy the waters by calling attention and potentially commenting on the evidence as to what was juvenile and what was adult.

RP (June 7, 2012) at 755-56.

Monroe argues that the trial court erred in failing to give a limiting instruction, but he fails to address all of the circumstances that the court considered in making its decision. Monroe's testimony about his juvenile history was inaccurate. Among other things, he characterized his adult conviction for first degree arson—a class A felony—as a juvenile offense. Defense counsel acknowledged that any limiting instruction under the circumstances would be "awkward" and made no attempt to draft an appropriate instruction. Although an accurate limiting instruction would have addressed three juvenile misdemeanors, it might also have emphasized the existence of Monroe's most serious adult conviction and suggested that Monroe had falsely described his juvenile history. The State did not attempt to correct the inaccuracies in Monroe's testimony. Under the circumstances, the trial court did not abuse its discretion in relying on the standard pattern instruction for prior convictions. See State v. Walker, 136 Wn.2d 767, 771-72, 966 P.2d 883 (1998) (trial court's decision to give a particular limiting instruction is reviewed for an abuse of discretion).

Moreover, any error in the admission of the three juvenile offenses was harmless. The reference to each offense was brief. Monroe flatly denied ever

committing malicious mischief and explained that the harassment conviction involved "arguing over a bike," and the State never offered any rebuttal evidence to challenge his assertions. RP (June 7, 2012) at 714. Finally, Monroe was charged with promoting prostitution in the first degree. Nothing in the record suggested that the circumstances of the juvenile misdemeanors were similar to the charged offense or that they might have triggered an emotional response by the trier of fact. Given the unchallenged evidence of Monroe's criminal history, there was no reasonable likelihood that the admission of the three juvenile offenses had any effect on the outcome of the trial. See State v. Gresham, 173 Wn.2d 405, 433, 269 P.3d 207 (2012).

Juror Misconduct

During a recess, defense counsel informed the court that "somebody in the audience said ... a juror might've been sleeping for a while, and another juror next to them are nudging them awake." RP (June 5, 2012) at 477. The judge responded that she had not noticed the incident and commented, "[I]t is something that we have to battle against from time to time in the afternoons." RP (June 5, 2012) at 477. After the deputy prosecutor indicated he had not seen anything, the court asked for counsels' assistance in watching out for any potential misconduct. Defense counsel agreed. Monroe contends that the trial court violated his right to a fair trial when it failed to investigate the possible juror misconduct.

The trial judge has a duty "to excuse from further jury service any juror, who in the opinion of the judge, has manifested unfitness as a juror by reason of . . . inattention . . . or by reason of conduct or practices incompatible with proper and

-10-

efficient jury service." RCW 2.36.110. RCW 2.36.110 and CrR 6.5 place a continuous obligation on the trial court to excuse any juror who is unfit and unable to perform the duties of a jury. State v. Jorden, 103 Wn. App. 221, 226-27, 11 P.3d 866 (2000). The trial court need not follow any particular format in establishing a record of juror misconduct and has broad discretion to resolve misconduct issues "in a way that avoids tainting the juror and, thus, avoids creating prejudice against either party." Jorden, 103 Wn. App. at 229.

Here, defense counsel communicated an anonymous report that an unidentified juror "might've been sleeping for a while." Neither counsel nor the trial judge had observed the alleged incident. Defense counsel raised no objection, did not request an investigation, and agreed to assist in watching out for any future misconduct. Given the vague nature of the reported conduct, the trial court's decision to forgo an immediate investigation and focus additional attention on the jurors was reasonable. The record contains no further allegation of juror misconduct.

Monroe asserts that he is "entitled to a new trial regardless of whether the record shows misconduct occurred." Br. of Appellant at 44. But he relies solely on decisions in other jurisdictions involving specific and corroborated incidents of possible juror misconduct. See, e.g., People v. Valerio, 141 A.D.2d 585, 529 N.Y.S.2d 350 (1988) (trial judge failed to conduct inquiry despite announcing that "[w]e had two jurors that were dozing"); People v. South, 177 A.D.2d 607, 576 N.Y.S.2d 314 (1991) (trial court observed juror with eyes closed); Commonwealth v. Dancy, 75 Mass. App. Ct. 175, 912 N.E.2d 525 (2009) (trial court observed juror repeatedly falling asleep). No comparable

circumstances were present here. The trial court's failure to undertake an immediate investigation was not an abuse of discretion.

Ineffective Assistance of Counsel

Monroe next contends that defense counsel's performance was constitutionally deficient. He therefore bears the burden of demonstrating (1) that defense counsel's representation fell below an objective standard of reasonableness and (2) resulting prejudice, i.e., a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). We begin our analysis with the "strong presumption" that counsel's performance was reasonable. State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). To rebut this presumption, Monroe must establish the absence of any conceivable legitimate tactic explaining counsel's performance. State v. Grier, 171 Wn.2d 17, 42, 246 P.3d 1260 (2011). We review ineffective assistance claims de novo. State v. Sutherby, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

Venue

Monroe asserts that the case should have been tried in Snohomish County and that defense counsel was therefore deficient because she failed to challenge venue in King County or propose that venue be included in the jury instructions. But the record establishes that venue was proper in King County.

Generally, criminal actions must be commenced in the county where the offense, or an element of the offense, was committed. CrR 5.1(a). Under article I, section 22 of the Washington Constitution, the defendant has the right "to have a speedy public trial

-12-

... [in] the county in which the offense is charged to have been committed . . . ." If there is "reasonable doubt whether an offense has been committed in one of two or more counties, the action may be commenced in any such county." CrR 5.1(b).

Venue is not an element of a crime, and the defendant must generally raise any challenge before trial. State v. Dent, 123 Wn.2d 467, 479-80, 869 P.2d 392 (1994). If the defendant challenges venue based on evidence presented during trial, the State must prove venue by a preponderance of the evidence. Dent, 123 Wn.2d at 480-81.

In order to convict Monroe of promoting prostitution in the first degree, the State had to prove that he knowingly advanced prostitution or profited from prostitution by compelling JW with threat or force to engage in prostitution. RCW 9A.88.070(1)(a). A defendant advances prostitution by causing or aiding another person to engage in prostitution or engaging "in any other conduct designed to institute, aid, or facilitate an act or enterprise of prostitution." RCW 9A.88.060(1).

The State presented evidence that Monroe began pressuring JW to work for him as a prostitute while he was living in Kirkland and she was living in Renton. Shortly after moving in with Monroe in Kirkland, JW began "walking" for him. Monroe drove JW from Kirkland to Highway 99, dropped her off, and then picked her up when she was done.

Because the State presented evidence that Monroe advanced prostitution in King County, venue was proper in King County. CrR 5.1(a)(2). Consequently, Monroe cannot demonstrate that defense counsel's failure to challenge venue was either

deficient performance or prejudicial.

### Agent Vienneau's E-mail

Monroe contends that defense counsel was ineffective for failing to present evidence about Agent Vienneau's "crucial e-mail that stated his belief at the time that Monroe was not a threat to the alleged victim." Br. of Appellant at 53. When defense counsel sought to cross-examine Detective Jaycin Diaz about the contents of the e-mail, the trial court sustained the State's hearsay objections. Monroe argues that defense counsel should have asked Agent Vienneau about the e-mail to avoid the hearsay objections.

To support his argument, Monroe cites only defense counsel's attempt to ask Detective Diaz whether "that e-mail actually state[s] that [JW] was prostituting." Br. of Appellant at 54. But Monroe makes no showing that Agent Vienneau's e-mail offered any opinion on Monroe or the potential threat that he may have posed to JW. Consequently, his claim of ineffective assistance necessarily fails.

### Failure to Call Victoria Burden

Monroe next contends that defense counsel was ineffective for failing to call Victoria Burden "or any other defense witness." Br. of Appellant at 57. But the decision whether to call a specific witness is generally a matter of trial strategy that will not support a claim of ineffective assistance. State v. Maurice, 79 Wn. App. 544, 552, 903 P.2d 514 (1995). Moreover, Monroe fails to identify what Burden or any other potential defense witness would have said. See State v. Weber, 137 Wn. App. 852, 858, 155 P.3d 947 (2007) (The failure to investigate or call witnesses is not prejudicial unless the

-14-

record establishes that the witnesses would have been helpful to the defense.). His claim that Burden "likely" would have testified that she never witnessed Monroe threaten JW is unsupported by anything in the record and therefore cannot be addressed on direct appeal. See McFarland, 127 Wn.2d at 337–38.

Inadequate Trial Preparation

Finally, Monroe contends that retained defense counsel, who substituted in six days before trial began at his insistence, was unprepared for trial. He fails, however, to identify any instances of deficient performance beyond those already alleged. For the reasons already discussed, Monroe has made no showing that defense counsel's failure to challenge venue, call additional defense witnesses, and or cross-examine Agent Vienneau about his e-mail was deficient performance or prejudicial. His claims of inadequate trial preparation are therefore without merit.

Affirmed.

WE CONCUR: