# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>               Respondent,<br><br>    v.<br><br>FRANCISCO JAVIER ESCOBEDO,<br><br>               Appellant. | DIVISION ONE<br><br>No. 78310-6-I<br><br>UNPUBLISHED OPINION<br><br>FILED: December 23, 2019 |

DWYER, J. — Francisco Escobedo was charged with murder in the second degree and unlawful possession of a firearm in the second degree. A jury found him guilty on the first count; he waived his right to a jury trial on the second count and was found guilty by the trial court. He appeals both convictions. As to the first count, he contends that the trial court abused its discretion by not giving a jury instruction on justifiable homicide. As to the second count, he avers that an out-of-state conviction that served as the predicate offense for the charge of unlawful firearm possession is not comparable to any Washington felony. Finally, in a statement of additional grounds, he assigns error to an evidentiary ruling at his murder trial.[1] Finding no error, we affirm.

---

[1] In his opening brief, Escobedo challenged the imposition of a filing fee and a deoxyribonucleic acid (DNA) test collection fee. However, in his reply brief, he concedes that the filing fee was never imposed and that he has no basis to challenge the DNA fee, thus abandoning the claims.

I

Francisco Escobedo hosted Alize Gonzalez, Teyanna Palms, and Justin Cunningham at his apartment in Auburn on the night of November 9, 2015. They smoked methamphetamine. Gonzalez was also smoking heroin. Upon the exhaustion of her heroin supply, and her failure to reach her dealer in the early hours of November 10, Gonzalez became upset with Escobedo and began arguing with him.

Gonzalez made a phone call to some unknown individuals, inviting them to rob Escobedo's apartment. After the call she told Escobedo that the people she had invited over could kill him. Gonzalez did not make any subsequent phone calls. Escobedo then insisted that he would take the three of them home, but Gonzalez refused to leave. After further argument between Escobedo and Gonzalez, she indicated that she would leave, at which point Escobedo said, "No, you ain't going nowhere." When Escobedo again told Gonzalez she could not leave, she pushed him. Escobedo immediately produced a semi-automatic handgun from his pants pocket and racked the gun's slide.

This prompted Gonzalez, who was about seven inches shorter and 80 pounds lighter than Escobedo, to call him a "bitch" for threatening her with a gun. She approached Escobedo and attempted to strike his face. It is not clear whether she succeeded in doing so before Escobedo raised his weapon, pointed the barrel at Gonzalez from mere inches away, and pulled the trigger. Gonzalez was killed instantly; the force of the projectile not only severed her spinal cord but threw her head back against a wall before her body collapsed to the floor.

Escobedo stood over Gonzalez's lifeless body, repeating a phrase to the effect of "see what you made me do," as Cunningham entered the room. Cunningham attempted to talk Escobedo out of his anger and told him to dispose of the firearm, but Escobedo, undeterred and unaware that Gonzalez had perished, mused that Gonzalez would "snitch" if he left. Eventually, Cunningham convinced Escobedo to leave. Cunningham and Palms then fled the apartment, leaving Gonzalez's body inside.

Later, Escobedo returned to his apartment and, around 3:00 a.m., moved Gonzalez's body into the trunk of his vehicle for a drive to Kent, where he discarded the body in a residential alleyway. Later that day, around 2:00 p.m., Palms telephoned Auburn police to report the killing. Gonzalez's body was discovered by passersby around 4:00 p.m. After speaking with Palms, police obtained a warrant and searched Escobedo's apartment. Escobedo was arrested the following morning upon arriving to work his shift at a Burger King restaurant. He was charged with murder in the second degree.

The information was subsequently amended to add a charge of unlawful possession of a firearm in the second degree based on Escobedo's 2004 felony conviction in California. Escobedo had then pled guilty to "unlawful taking or driving of a vehicle," proscribed by California Vehicle Code § 10851(a). The trial court ruled that this offense was comparable to the Washington felony of taking of a motor vehicle without permission in the second degree, as set out in RCW 9A.56.075. Escobedo waived his right to a jury trial on this count. The court

found beyond a reasonable doubt that the California conviction was Escobedo's, rendering his possession of a firearm unlawful, and entered a finding of guilt.

At the jury trial on the count of murder in the second degree, Escobedo testified in his own defense. He insisted that he was never afraid of the unarmed, 19-year-old Gonzalez but, rather, that he was afraid that the individuals she purportedly invited over might rob or kill him. As he stated during his direct examination:

> Q. [By defense counsel]: Why did you draw that gun?
> A. [Defendant]: I drew it because I was scared somebody was going to rob me.
> Q. Were you scared that Alize herself was going to rob you?
> A. No.
> Q. Who was it that you were afraid was going to rob you?
> A. The other people that were on the other side of the phone call.
> Q. The other people—no one eventually showed up, as it turned out?
> A. No.
> Q. Are you afraid that Alize herself was going to kill you?
> A. No.
> Q. Are you afraid that she's going to seriously injure you?
> A. No.
> Q. Are you afraid that someone might seriously injure you?
> A. Yes.
> Q. And that's the people coming up the stairs?
> A. Yes.

Escobedo also insisted that he did not intend to shoot Gonzalez—rather, he claimed that he pointed the weapon toward the door in anticipation of a robbery and that it discharged when he pushed Gonzalez's hand away and her hand touched the trigger:

> Q. [By defense counsel] Are you trying to pull that arm back, the arm with the gun that she's grabbing?
> A. [Defendant] Yes.
> Q. So are you just pulling back with your arm or also pulling your body to one side or the other?

4

A. I'm pushing her off. At the same time when I felt my hand coming forward, I tried pulling it back too.
Q. Just pulling your hand back, or are you also leaning back or twisting or anything like that?
A. I'm not really sure how to describe that. I know I'm pushing her off. At the same time the hand is going forward, but at the same time I'm pushing her off and trying to pull the gun back.
Q. You can sit down, Mr. Escobedo. Thank you. So you intentionally shoot her through the neck?
A. No.
Q. Do you intentionally shoot next to her to try to scare her off?
A. No.
Q. The gun goes off?
A. Yes.
Q. She falls to the ground?
A. Yes.
Q. Do you think she's dead right at that moment?
A. Not at the moment.
Q. Why?
A. I wasn't sure if she got hit or not.
Q. How can you not be sure that she got hit?
A. Because I wasn't pointing the gun at her.

The State requested the following jury instruction regarding the definition

of murder in the second degree:

> A person commits the crime of murder in the second degree when he commits or attempts to commit Assault in the Second Degree and in the course of and in furtherance of such crime he or she causes the death of a person other than one of the participants.

This proposed instruction was identical to that which was given to the jury.

The State's proposed instructions defining assault included a self-defense

definition, acknowledging that there was some evidence Escobedo drew the

weapon in fear. These instructions, when given by the trial court to the jury, read

as follows:

> An assault is an intentional shooting of another person that is harmful or offensive regardless of whether any physical injury is done to the person. A shooting is offensive if the shooting would offend an ordinary person who is not unduly sensitive.

5

Instruction 17.

An assault is also an act, with unlawful force, done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury.

Instruction 19.

It is a defense to Assault in the Second Degree, when the assault with a deadly weapon was committed in the manner defined in instruction 19, that the force used, attempted or offered to be used was lawful as defined in this instruction.

The use of, attempt to use or offer to use force upon or toward the person of another is lawful when used, attempted or offered, by a person who reasonably believes that he is about to be injured in preventing or attempting to prevent an offense against the person, and when the force is not more than is necessary.

The person using or offering to use the force may employ such force and means as a reasonably prudent person would use under the same or similar conditions as they appeared to the person, taking into consideration all of the facts and circumstances known to the person at the time of and prior to the incident.

The State has the burden of proving beyond a reasonable doubt that the force used, attempted, or offered to be used by the defendant was not lawful. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty.

Instruction 20.

As it pertains to instructions 19 and 20, necessary means that, under the circumstances as they reasonably appeared to the actor at the time, (1) no reasonably effective alternative to the use of force appeared to exist and (2) the amount of force used was reasonable to effect the lawful purpose intended.

A person is entitled to act on appearances in defending himself, if he believes in good faith and on reasonable grounds that he is in actual danger of injury, although it afterwards might develop that the person was mistaken as to the extent of the danger. Actual danger is not necessary for the use of force to be lawful.

It is lawful for a person who is in a place where that person has a right to be and who has reasonable grounds for believing that he is being attacked to stand his ground and defend against such

6

attack by the use of lawful force. Notwithstanding the requirement that lawful force be "not more than is necessary," the law does not impose a duty to retreat. Retreat should not be considered by you as a "reasonably effective alternative."

Instruction 21.

The court declined to give Escobedo's proposed justifiable homicide instruction, stating:

In this Court's opinion, given all of the evidence, there is no legitimate evidence of an intentional shooting that would support [a] justifiable [homicide] defense. I do not believe it is a legitimate defense based on the evidence. And as such, this Court is not going to present it to the jury for consideration.

The jury found Escobedo guilty of murder in the second degree, and the court imposed a term of 270 months of confinement to be followed by 36 months of community custody. Escobedo appeals.

II

Escobedo first contends that the trial court erred when it declined to give a jury instruction on the defense of justifiable homicide. This decision, he avers, was an abuse of discretion that compromised his ability to present his theory of the case, thus denying him a fair trial. To the contrary, because a justifiable homicide instruction was not supported by the evidence and because Escobedo was not actually prevented from arguing his theory of the case under the instructions given, there was no abuse of discretion and no error.

"Jury instructions satisfy the defendant's Sixth Amendment right to a fair trial if, taken as a whole, they accurately inform the jury of the relevant law and permit each party to argue their theory of the case." State v. Henderson, 192 Wn.2d 508, 512, 430 P.3d 637 (2018). A trial court's refusal to issue a requested

instruction, when based on the evidence in the case, is reviewed for abuse of discretion. State v. Walker, 136 Wn.2d 767, 771-72, 966 P.2d 883 (1998). A trial court abuses its discretion only when its decision is "manifestly unreasonable or based upon untenable grounds or reasons." State v. Powell, 126 Wn.2d 244, 258, 893 P.2d 615 (1995). If any element of such an instruction is not supported by the evidence, the defendant cannot present the theory to the jury. State v. Griffith, 91 Wn.2d 572, 575, 589 P.2d 799 (1979).

A defendant is entitled to an instruction on justifiable homicide only when evidence is introduced that the killing occurred in circumstances amounting to a justifiable homicide. State v. Brightman, 155 Wn.2d 506, 520, 122 P.3d 150 (2005). Washington law defines justifiable homicide, when committed in resistance to an attempted felony, as follows:

Homicide is . . . justifiable when committed . . . :

(1) In the lawful defense of the slayer, or his or her husband, wife, parent, child, brother, or sister, or of any other person in his or her presence or company, when there is reasonable ground to apprehend a design on the part of the person slain to commit a felony or to do some great personal injury to the slayer or to any such person, and there is imminent danger of such design being accomplished; or

(2) In the actual resistance of an attempt to commit a felony upon the slayer.

RCW 9A.16.050.

Under either subsection, a justifiable homicide instruction "requires a jury to find that the defendant reasonably believed the person slain (or others who the defendant reasonably believed were acting in concert with the person slain)

intended to commit a felony or to inflict death or great personal injury."

Henderson, 192 Wn.2d at 513. As the Supreme Court stated in Brightman:

> RCW 9A.16.050(1) contemplates justifiable homicide where the defendant reasonably fears the person slain is *about to* commit a felony upon the slayer or inflict death or great personal injury, and there is *imminent* danger that the felony or injury will be accomplished. See [RCW] 9A.16.050(1). In contrast, RCW 9A.16.050(2) considers a homicide justifiable where the defendant acted in *actual resistance* against an attempt to commit a felony on the slayer. . . . Thus, RCW 9A.16.050(2) addresses situations in which a felony or attempted felony is already in progress.

155 Wn.2d at 520-21.

As to the imminent danger requirement of RCW 9A.16.050(1), "[i]mminence does not require an actual physical assault. A threat, or its equivalent, can support self-defense when there is a reasonable belief that the threat will be carried out." State v. Janes, 121 Wn.2d 220, 241, 850 P.2d 495 (1993) (citation omitted).

There is some evidence in the record supporting Escobedo's fear that Gonzalez had solicited others who might rob or kill him—Gonzalez told him as much. In Escobedo's own testimony he claimed that he saw his apartment door open and heard Gonzalez giving an apartment entry code to Escobedo's would-be attackers. Escobedo testified that he was not fearful of Gonzalez herself but only of the people she purportedly solicited to rob his apartment. Escobedo also testified to being wary of Gonzalez's gang connections. Although Escobedo testified that the shooting was accidental, undercutting the notion of an intentional killing in self-defense, Palms and Cunningham both testified that Escobedo deliberately aimed the gun at Gonzalez and fired.

However, even viewed in the light most favorable to Escobedo, this evidence does not support the notion that Escobedo held an objectively reasonable belief that there was an imminent danger of a felony assault that necessitated intentionally *killing* Gonzalez. Escobedo repeatedly testified that he was not afraid of Gonzalez but of her friends. She was not armed, she was much smaller than Escobedo, and she was not on the phone with the would-be attackers when her final argument with Escobedo took place. Even if a scheme existed, there is simply no evidence that killing Gonzalez was necessary to prevent her from carrying it out. Escobedo, in fact, never argued as such—his theory of the case was always that the shooting was not intentional.

Thus, the trial court's ruling was based on tenable reasoning—the instruction sought was not warranted by the evidence adduced. The self-defense instruction that was given adequately and properly informed the jury of the applicable law regarding when assault is justifiable as a matter of self-defense.

The instructions given allowed Escobedo to argue his theory of the case. In his closing argument, Escobedo's attorney stated that "even actually if he pointed the gun, he is entitled to do that in self-defense" because of Gonzalez's threats, and that "if somebody is going to kill you, you're allowed to do that." His attorney also reiterated Escobedo's contention that the gun discharged accidentally due to Gonzalez making contact with him. Had the jury believed that Escobedo acted in fear for his life, and that Gonzalez's sudden movement caused the gun to discharge, it could not have convicted him under the

instructions given. The trial court did not err by declining to give a justifiable homicide instruction.

III

Escobedo next contends that the predicate offense for his conviction of unlawful possession of a firearm, his 2004 felony conviction in California for the unlawful taking of a motor vehicle, was not comparable to the Washington felony of taking a motor vehicle without permission. This is so, he asserts, because California's statute has a broader definition of the crime than does Washington's. Because the California statute in fact defines the crime more narrowly than Washington's comparable statute, Escobedo's argument fails.

Pursuant to Washington law, a person commits unlawful possession of a firearm in the second degree

> if the person does not qualify . . . for the crime of unlawful possession of a firearm in the first degree and the person owns, has in his or her possession, or has in his or her control any firearm:
>
> (i) After having previously been convicted . . . in this state or elsewhere of any felony not specifically listed as prohibiting firearm possession under subsection (1) of this section.

RCW 9.41.040(2)(a).

Typically, in reviewing an out of state conviction, the trial court conducts a comparability analysis in which "[o]ut-of-state convictions are classified according to the comparable offense definitions and sentences provided in Washington law." State v. Stevens, 137 Wn. App. 460, 465, 153 P.3d 903 (2007) (citing RCW 9.94A.525(3)). The comparability analysis for the predicate "serious

11

offense" element for unlawful possession of a firearm is the same comparability analysis as is used for classifying prior out-of-state convictions in determining a defendant's offender score at sentencing. RCW 9.94A.525(3); see Stevens, 137 Wn. App. at 465 (unlawful possession of a firearm); see also State v. Arndt, 179 Wn. App. 373, 378-79, 320 P.3d 104 (2014) (offender score).

The principal inquiry for determining the comparability of an out-of-state conviction is whether the defendant could have been convicted under a Washington statute for the same conduct. State v. Thiefault, 160 Wn.2d 409, 414-15, 158 P.3d 580 (2007) (classifying out-of-state convictions for purposes of persistent offender sentencing). A comparability analysis covers (1) "legal comparability," and (2) "factual comparability." Arndt, 179 Wn. App. at 378-79. For "legal comparability," the court compares the elements of the out-of-state crime to those of the relevant Washington crime to determine if they are "substantially similar." Thiefault, 160 Wn.2d at 415. Only if legal comparability is not established do we reach the question of factual comparability. See Arndt, 179 Wn. App. at 379.

"If the foreign conviction is identical to or narrower than the Washington statute and thus contains all the most serious elements of the Washington statute, then the foreign conviction counts toward the offender score as if it were the Washington offense." State v. Olsen, 180 Wn.2d 468, 472-73, 325 P.3d 187 (2014). "If the elements of the foreign offense are broader than the Washington counterpart, the sentencing court must then determine whether the offense is factually comparable—that is, whether the conduct underlying the foreign offense

12

would have violated the comparable Washington statute." Thiefault, 160 Wn.2d at 415.

A statute is narrower than another if it contains an additional essential element that the other statute does not. See In re Pers. Restraint of Lavery, 154 Wn.2d 249, 255-56, 111 P.3d 837 (2005) (holding Washington robbery statute to be narrower than federal statute because former required specific intent to steal while latter did not). At the time of Escobedo's 2004 conviction, California Vehicle Code § 10851(a) stated:

> Any person who drives or takes a vehicle not his or her own, without the consent of the owner thereof, and with intent either to permanently or temporarily deprive the owner thereof of his or her title to or possession of the vehicle, whether with or without intent to steal the vehicle, or any person who is a party or an accessory to or an accomplice in the driving or unauthorized taking or stealing, is guilty of a public offense and, upon conviction thereof, shall be punished by imprisonment in the state prison for 16 months or two or three years or a fine of not more than ten thousand dollars ($10,000), or both, or by imprisonment in the county jail not to exceed one year or a fine of not more than one thousand dollars ($1,000), or both.

At that time Washington's RCW 9A.56.075 stated:

> (1) A person is guilty of taking a motor vehicle without permission in the second degree if he or she, without the permission of the owner or person entitled to possession, intentionally takes or drives away any automobile or motor vehicle, whether propelled by steam, electricity, or internal combustion engine, that is the property of another, or he or she voluntarily rides in or upon the automobile or motor vehicle with knowledge of the fact that the automobile or motor vehicle was unlawfully taken.
>
> (2) Taking a motor vehicle without permission in the second degree is a class C felony.

Thus, California's statute required that the perpetrator intend to deprive the owner of "title to or possession of the vehicle," while Washington's did not.

13

"[T]he [Washington] statute simply requires that the defendant (1) intentionally take the vehicle of another (2) without permission." State v. Walters, 162 Wn. App. 74, 86, 255 P.3d 835 (2011) (citing RCW 9A.56.075(1)).

Escobedo avers that California defines the offense more broadly because, under its statute, the defendant may act with intent "either to permanently or temporarily deprive" the owner of title to or possession of the vehicle, while Washington does not require any such intent. This argument is meritless. The existence of an additional element in the California statute, however qualified that element may be, renders the California statute narrower than Washington's. The State of California was required to prove beyond a reasonable doubt that Escobedo (1) drove or took a vehicle (2) without consent of the owner and (3) with intent to deprive. Were Escobedo to have been charged in Washington, only the first two elements needed to be proved.

The California statute is narrower and, thus, is legally comparable to the Washington statute. Therefore, we need not reach the question of factual comparability of the offenses. Arndt, 179 Wn. App. at 378-79. The California conviction was a sufficient predicate felony to support Escobedo's conviction of unlawful possession of a firearm in the second degree.

IV

In a statement of additional grounds, Escobedo faults the trial court's decision to allow questioning as to his familiarity with gang culture. That decision constituted reversible error, Escobedo avers, because this evidence was not

14

relevant and because it constituted character evidence forbidden by ER 404(b). However, Escobedo opened the door to such evidence with his own testimony.

The decision to admit or exclude evidence is within the sound discretion of the trial court; such a decision should not be reversed absent a manifest abuse of that discretion. State v. Iverson, 126 Wn. App. 329, 336, 108 P.3d 799 (2005). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or untenable reasons. Powell, 126 Wn.2d at 258. A court's decision is manifestly unreasonable if it adopts a view "'that no reasonable person would take,'" given the facts and applicable legal standard. State v. Rohrich, 149 Wn.2d 647, 654, 71 P.3d 638 (2003) (quoting State v. Lewis, 115 Wn.2d 294, 298-99, 797 P.2d 1141 (1990)). It is based on untenable grounds or reasons if the court applies the wrong standard or relies on unsupported facts. State v. Depaz, 165 Wn.2d 842, 852, 204 P.3d 217 (2009).

To be admissible, evidence must be relevant. ER 402. Evidence is relevant when it has any tendency to make the existence of any consequential fact more probable or less probable than it would be without the evidence. ER 401. Facts that tend to establish a party's theory or disprove or rebut an opponent's theory or evidence are relevant. Fenimore v. Donald M. Drake Constr. Co., 87 Wn.2d 85, 89, 549 P.2d 483 (1976). Yet ER 404(b) categorically bars the admission of evidence of prior misconduct or actions "for the purpose of proving a person's character and showing that the person acted in conformity with that character." State v. Gresham, 173 Wn.2d 405, 420, 269 P.3d 207 (2012).

Exceptions to this rule exist.

> Evidence of prior misconduct may be admissible if a party has "opened the door" to the subject. . . . Using the *open door* refers to the practice of using evidence that would otherwise be *inadmissible* to contradict evidence that probably should *not* have been admitted when offered by the opposing party. The latter practice has been aptly called "fighting fire with fire."
>
> . . . .
>
> The prosecution has often been allowed to cross-examine the defendant about other crimes or misconduct, or has been allowed to prove them by extrinsic evidence, on the theory that the defendant's testimony or other evidence "opened the door" to evidence offered by the State.

5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE § 404.31 (6th ed. 2018).

Put more simply, "'[t]he long-standing rule in this state is that a criminal defendant who places his character in issue by testifying as to his own past good behavior, may be cross-examined as to specific acts of misconduct unrelated to the crime charged.'" State v. Warren, 134 Wn. App. 44, 64-65, 138 P.3d 1081 (2006) (quoting State v. Brush, 32 Wn. App. 445, 448, 648 P.2d 897 (1982)), aff'd, 165 Wn.2d 17, 195 P.3d 940 (2008).

Such was the case here. Escobedo's purported wariness of street gangs and drug culture, and his association of Gonzalez, Cunningham, and Gonzalez's would-be accomplices with these phenomena was a significant component of his theory of the case. He alluded to this several times during his direct examination: Cunningham was a "to-go-to guy" for a drug dealer who would "take care of" people who owed money to the dealer and gave Escobedo a "weird vibe," Escobedo owed money to that drug dealer, and Gonzalez was connected to a gang and in contact with said dealer.

The State sought to rebut the notion that Escobedo was fearful of gang members by eliciting testimony about his past in the Logan Heights gang both in San Diego and in Washington. Overruling Escobedo's objection to eliciting this testimony, the trial court stated:

> Mr. Escobedo is claiming self-defense, which does put in issue his subjective mindset, if you will, on the date in question in terms of whether or not he was sufficiently in fear, if you will, to explain or justify pulling out a semi-automatic handgun. Recognizing that there is a theory that even though he did that, Ms. Gonzalez grabbed the gun, therefore, it went off accidentally.
>
> In listening to Mr. Escobedo's testimony as it relates to the issue of fear, his testimony suggests that Ms. Gonzalez may have been a member of a gang. She certainly was an addict and was using drugs, as were all of the people on the night or early morning in question.
>
> There was some testimony, and I'm not going to address it specifically, but generally speaking, suggesting that Mr. Cunningham had a reputation, the reputation being for gangs. Talking about Jairo being a drug dealer. Casper involved in drugs. Ms. Gonzalez getting on the phone and calling people to come over and rob Mr. Escobedo.
>
> Same type of person, if you will: Gang related, drug dealers, people of the community, people who have a tendency towards violence. And that he wakes up and he's afraid.
>
> I concur that Mr. Escobedo's testimony certainly suggests that he has minimal, if really any, involvement in gangs. Doesn't know much about them, if you will. And as a result, I do believe the door has opened to some very limited things.

Subsequently, on Escobedo's cross-examination, the State elicited testimony as to Escobedo's own membership in San Diego's Logan Heights gang. This included testimony that Escobedo considered fellow associates to be his "family," that he was familiar with street gangs' violent methods of dispute resolution, that he recruited younger members of his community into the gang, and that the reason for his departure from the gang was not his distaste for the lifestyle but his drug addiction.

From the record, it is clear that the trial court's reasoning for allowing this evidence—that Escobedo had opened the door to its admission—was tenable. Escobedo's testimony indicated discomfort with gangs and drug dealers, and the State sought to rebut the notion put forth that he was innocent of or naïve about gangs. Allowing this evidence was not an abuse of discretion. Thus, there was no error.

Affirmed.

WE CONCUR: